**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 96-41246

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

HIPOLITO GONZALEZ, JR., ABELARDO GERARDO GONZALEZ,
and ALBERTO JAVIER GONZALEZ

Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Texas

---

December 16, 1998

Before KING, SMITH and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge.

Appellants Hipolito Gonzalez, Jr. ("Hipolito Gonzalez"), Abelardo Gerardo Gonzalez ("Gerardo Gonzalez") and Alberto Javier Gonzalez ("Alberto Gonzalez") appeal their convictions and sentences for violations of drug and firearm statutes. We affirm in part, and vacate and remand in part.

**FACTS**

1

A.

The evidence at trial established the following facts.

Around 2:50 a.m. on September 8, 1995, Arturo Rocha, a United States Border Patrol agent, was monitoring the radio scanner from his post in Laredo. He overheard a conversation among three men speaking mostly in Spanish over two-way radios. The men used the names "Junior," "Gerry," and "René." Their discussion focused on whether the border patrol checkpoint in Hebbronville would close due to the severe thunderstorms in the area.[1] René told the others that four men and a dog were outside the checkpoint; one of the men expressed concern about the dog and suggested that they should wait until the dog left.

Rocha contacted his supervisor, suspecting that the three men were planning to smuggle drugs or illegal aliens. As he continued listening to the conversation, he overheard one of the men report that the checkpoint was now closed and its lights were out. The man noted, however, that there still appeared to be one agent inside the checkpoint and another agent two miles from the checkpoint on the other side of the road.

Based on the conversation, Rocha concluded that there would be two cars (a lead and a load car) traveling east on Highway 359 toward the Hebbronville checkpoint. Accordingly, Rocha, joined by another agent in a separate vehicle, positioned themselves

---

[1] Testimony at trial indicated that smugglers were aware that the Border Patrol often closed this checkpoint in bad weather.

alongside the dark highway.  Within minutes a Dodge pickup sped by, followed closely by a white Lincoln Town Car.  As the agents pulled out and tailed the vehicles, the Town Car exited the highway, turned into a subdivision and parked in front of a house.  Rocha parked behind the car with his high beams on.  The driver turned around and looked at Rocha; the agent later identified the driver as Gerardo Gonzalez.  As Rocha left his vehicle and approached the Town Car, the driver made a quick u-turn and re-entered the highway, this time heading west.  When the driver passed him in the subdivision, Rocha noted that he was wearing a black coat with gold around the neck.  Rocha pursued the car with his siren and emergency lights, radioing for assistance.

As the chase proceeded west down Highway 359, the Dodge pickup -- which had continued east when the Town Car turned into the subdivision -- suddenly made a u-turn and sped west down the highway.  The pickup caught up with the police chase, passed Rocha's car, then, positioning itself between Rocha's car and the Town Car, slowed down and began weaving between lanes.  The maneuver allowed the Town Car to speed off alone down the highway.

By this time, other agents had joined the chase.  Although the Town Car had shaken its pursuit, the agents nevertheless spotted it at a distance turning into another subdivision.  They followed it in, but were too late.  The car was abandoned, having fishtailed and stuck in the mud.  The agents discovered 22 bundles of marijuana in the trunk; the driver had escaped.  The car was

3

registered to Gerardo Gonzalez.

Back on the highway, the Dodge pickup was now leading a small caravan of law enforcement down the highway and through the neighborhoods of Laredo. It finally stopped in front of the Gonzalez family house. Hipolito emerged from the truck and was subdued after a struggle. The police found an unloaded revolver on the back seat and a box of ammunition in the front console. They also found a two-way radio on the front seat.

During the highway pursuit, a roving Border Patrol agent spotted a white Chevrolet Suburban about 13 miles west of the Hebbronville checkpoint on Highway 359. The car was traveling toward Laredo. The agent ran a computer check and determined that the Gonzalez family owned a white Chevrolet Suburban. As the agent began following the suburban, the driver sped up, posting 60 m.p.h. in a 20-30 m.p.h. zone. The Suburban was pulled over and the driver, Alberto, consented to a search. The agent found a two-way radio, two cellular phones, red-and-blue emergency lights, latex gloves, and a large knife.

The police obtained a search warrant for the Gonzalez home. Inside they found a black coat with gold around the neck; the coat was damp and muddy. They also found a two-way radio that was muddy. The police maintained surveillance at the family compound, waiting for the missing Gerardo Gonzalez. At around 9:30 a.m. the next morning, Gerardo Gonzalez appeared carrying a white box. He and his mother got into a car and drove to another house in Laredo.

4

Mrs. Gonzalez gave the box to a younger woman who had come out of the house. The officers then approached the group and obtained consent to open the box. Inside they found a digital scale.

B.

Hipolito Gonzalez, Gerardo Gonzalez and Alberto Gonzalez[2] were charged with conspiracy to possess with intent to distribute 459 pounds of marijuana (21 U.S.C. § 841(a)(1) & (b)(1)(B) and 21 U.S.C. § 846) and possession with intent to distribute marijuana (21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2). Hipolito was also charged with carrying a firearm in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)) and with being a felon in possession of a firearm (18 U.S.C. § 922(g)(1) and § 924(a)(2)).

The first trial was interrupted by two bomb threats and ended in a hung jury (11-1). The second trial also ended in a mistrial after three jurors reported that they received anonymous calls urging them to convict the defendants. The court, *sua sponte*, then transferred venue from the Laredo Division to the Houston Division. Following the third jury trial, all defendants were convicted on all counts.

---

[2]A fourth Gonzalez brother, René Gonzalez, is not a defendant in this case.

## DISCUSSION

## I. Venue

The Gonzalezes claim the district court erred by transferring venue from the Laredo Division to the Houston Division of the Southern District of Texas. As noted above, the district court transferred the case from Laredo to Houston after the second mistrial. The court offered several reasons for its decision, including the interruptions by bomb threats, the jury tampering, and considerable publicity in Laredo from the first two trials. The district court's decision to transfer venue is reviewed for abuse of discretion. *United States v. Asibor*, 109 F.3d 1023, 1037 (5th Cir.), *cert. denied*, 118 S. Ct. 638 (1997).

The defendants challenge the district court's decision on three bases. First, they claim a constitutional right to trial within the *division*SSnot just the districtSSwhere the offenses were committed. This claim is without merit. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and *district* wherein the crime shall have been committed . . . .") (emphasis added). *See also United States v. McKinney*, 53 F.3d 664, 673 (5th Cir. 1995) ("There is no constitutional right to be tried in a particular division within a district.").

Second, the defendants claim a statutory right, under FED. R. CRIM. P. 18, to trial within a particular division. This too is

6

without merit.  *See* FED. R. CRIM. P. 18 ("the prosecution shall be had in a *district* in which the offense was committed") (emphasis added).

Third, the Appellants argue that the jurors in Houston were confused by the Hispanic names and nicknames involved in the trial as well as with the Spanish names of locations in Laredo and surrounding areas and with Spanish terms used during the trial. This claim, not raised before the district court, is unsupported by precedent or by the record.  We conclude that the district court's decision to transfer venue was not an abuse of discretion or the violation of a constitutional or statutory right.

## II. Sufficiency: Drug charges

The defendants challenge the sufficiency of the evidence underlying their drug convictions.  Viewing all evidence and any inferences that may be drawn from it in the light most favorable to the government, we must determine whether a rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt.  *See United States v. Ivey*, 949 F.2d 759, 756 (5th Cir. 1991).

### A. Hipolito Gonzalez

Hipolito Gonzalez claimed that his brother's car was stolen from a fairground in Mexico earlier that evening and that he happened to spot it on the highway at 3 a.m. outside Laredo.  He claims that he was giving chase to what he thought was his

brother's stolen Town Car. He argues that he was *in front of* the car when the police first spotted them because he was trying to catch a glimpse in his rear-view mirror of who might be driving the car. Once the Town Car had escaped, he led police on a chase through Laredo because they were pursuing him at such high speeds he was afraid that if he stopped suddenly the police cars would ram him from behind.

While Hipolito Gonzalez's story may provide a possible innocent explanation of some of the evidence, rational jurors could have found all the elements of the offenses beyond a reasonable doubt.

### B. Gerardo Gonzalez

Gerardo Gonzalez argues that there was no evidence he was the driver of the Town Car. He claims that Rocha initially identified *Hipolito* as the driver. He also notes that no witness testified that he knew there was marijuana in the trunk.

Nonetheless, the evidence is more than sufficient to support Gerardo Gonzalez's conviction. First, there was the radio conversation involving "Gerry." Second, Rocha testified that Gerardo was the driver of the Town Car. Third, the Town Car recovered from the mud was registered in his name. Fourth, the police found a muddy coat and a muddy two-way radio in Gerardo's parents' house in the Gonzalez compound. Fifth, Gerardo was

8

observed the morning after the chase bearing a white box containing a scale that agents testified was of the type commonly used in drug transactions. (Gerardo claims the scale belonged to his mother, who was bringing it to a daughter grappling with a weight-loss problem.) We conclude that the evidence was sufficient to support a finding that Gerardo Gonzalez knowingly conspired to and did in fact possess marijuana with intent to distribute.

## C. Alberto Gonzalez

Alberto Gonzalez argues that the mere presence of the two-way radio in his Suburban does not suffice to establish conspiracy; he also claims he was busy that night driving for his limousine service.

The government's theory of the case was that Alberto Gonzalez was the smuggler conducting surveillance of the Hebbronville checkpoint. Because the two-way radio did not have the range to reach Hebbronville from Laredo, the government theorized that Alberto Gonzalez called in his reports on the cellular phone that was in his car. He spoke with René, who then relayed these communications on to Hipolito and Gerardo. In addition to the presence of the radio, Alberto's initial attempt to flee from the police supports a finding of guilt. And the fact that he was driving in the wee hours in the vicinity of the Hebbronville checkpointSSwhen we know that *someone* was updating his brother René on the status of the checkpoint at that timeSSis further support

9

for the jury verdict. This evidence, viewed in the light most favorable to the government, was sufficient to support Alberto's convictions.

### III. Sufficiency: Firearms charges

Hipolito Gonzalez also challenges the sufficiency of the evidence underlying his convictions for carrying a firearm during a drug trafficking crime and for felon-in-possession. He does not dispute that there was a gun in plain view in the back seat, nor does he dispute his prior conviction for marijuana smuggling or the other statutory elements. Instead, he claims he was unaware of the gun's presence. Specifically, Hipolito claims that his mother, unbeknownst to him, placed her revolver (and ammunition) in the back seat of his pickup, and that he failed to notice it until after his unsuccessful pursuit of his brother's stolen car.

As a sufficiency challenge, this claim fails. The jury opted not to believe Hipolito's version of the story. Hipolito was driving a pickup registered in his name with a gun in the back seat during a drug smuggling trip. The jury was entitled to conclude that Hipolito knew the gun was there.

### IV. Jury tampering

The defendants claim that the district court violated their constitutional rights when it forbade them to conduct their own investigation into jury tampering during the second trial. Specifically, the defendants allege that their due process rights

10

were violated and that they were denied effective assistance of counsel. They take the position that the district court wrongly prevented defense counsel from conducting post-mistrial juror interviews, which might have enabled them to discover evidence that the government was behind the tampering and serve as the basis for a double-jeopardy claim.

A.

During the second trial, after the government had rested its case, three jurors told the judge that they had received anonymous calls the night before. The trial court notified the parties and, after securing their agreement, questioned the three jurors *ex parte* and on the record. The first juror reported that the caller had urged him to find the defendants guilty; the juror also mentioned that he thought the caller sounded like one of the government witnesses. The second juror said she too was urged to convict, but that she did not recognize the caller's voice. The third juror did not take the call herself, but was informed that the caller said the defendants had pleaded guilty so there was no need to come to court the next day.

The district court reported the jurors' stories to the parties. The defense moved for a mistrial; the government did not oppose the motion and the court granted it. The defense lawyers then asked the court whether they could question the jurors and conduct their own investigation into the tampering. The court

11

noted that it had already granted the defendants' motion for a mistrial and denied the request. The court added that if the defendants persisted in their desire to question the jurors, they could file a written motion giving the reasons why a defense investigation was necessary and the court would reconsider the request. The court also ordered the defense not to contact any of the jurors. The court then requested an FBI investigation into the tampering. (The identity of the caller or callers was, apparently, never discovered.)

Two months later, on the eve of the third trial, the defendants filed a motion for continuance. They alleged that the court had wrongly denied them access to the jurors and that they hoped to showSSbased on one juror's statement that the caller sounded like a government witnessSSthat the tampering was a result of "outrageous government conduct" sufficient to form the basis of a double-jeopardy claim.

The district court denied the motion, finding that the last-minute nature of the filing indicated "a clear defense motive to delay this trial for reasons other than the interests of justice." The court found that "[a]ll of the arguments advanced by the defense in support of the motion for continuance could have been made immediately after the second trial." The court added that the FBI was conducting its own investigation and that there was no need to delay the trial in order to allow the various investigations to be completed. Finally, the court directed the government that "if

12

there is any *Brady* or *Giglio* evidence concerning any government witness who testifies at trial, which has come to light as a result of the investigation of the FBI into third party contacts with members of the second jury, or which may be in the possession of any other agency of the United States or of the United States Attorneys' Office, such evidence is to be made available, for purposes of cross-examination, to the attorneys for the defense."

Later, during sentencing proceedings, the Government told the district court that the FBI investigation was complete and that the Bureau had been unable to determine who placed the phone calls. The district court ordered the government to turn over a copy of the report to the defense. Soon thereafter, the government filed a motion stating that the Assistant United States Attorney had been mistakenSSthe investigation was *not* finishedSSand asking the court to reverse its order. The court granted the motion, noting:

> Based upon the court's own interview with the jurors in the case and upon the circumstances and timing of the telephone calls made to these jurors, the court finds that it is highly unlikely that a government witness or anyone else from the government would prejudice a possible conviction in this matter by tampering with the jury and causing a mistrial the morning after the government had rested. The government had put on essentially the same case it had put on at the first trial, and had no motive to interrupt the trial and attempt to cause a third trial. A defense investigation of the matter would be highly intrusive into the lives of the jurors and would in all likelihood be fruitless.

The government takes the position that the motion for a mistrial waived any double-jeopardy protection. It did not. In

13

*Oregon v. Kennedy*, 456 U.S. 667, 676 (1982), the Supreme Court stated that "only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." That sort of governmental conduct is precisely what the defense is claiming happened here, so the government's waiver argument is unpersuasive. If what the defendants surmise happened, they can still raise double jeopardy.

                              B.

However, the defendants' claim is flawed in other ways. Defendants allege a violation of constitutional rights stemming from the district court's failure to permit an independent defense investigation. The defendants argue that because their lawyers were not given access to the jurors, they were denied effective assistance of counsel. The district court, once it had granted their request for a mistrial, did not violate the defendants' rights by forbidding juror interviews. Particularly in light of the government's *Brady* obligationSSan obligation of which the district court reminded the government in its order denying a continuanceSSthe defendants' claim fails. If the defendants discover evidence that the government *did* suppress exculpatory

14

evidence, they can proceed through § 2255.[3]  However, the record on direct appeal does not support a finding of ineffective assistance of counsel.

### V. Obstruction of justice

The defendants argue that the district court erred in adding two levels to their base offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1.  The guideline provides for a two-level increase when the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense . . . ."  U.S.S.G. § 3C1.1.  If the district court finds that a defendant perjured himself at trial, this enhancement is required.  *See United States v. Morris*, 131 F.3d 1136, 1140 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1546 (1998).  We review the district court's determination for clear error.  *See id*.  Here, the court applied the enhancement after adopting the Presentence Reports' conclusions that each defendant committed perjury at trial.  Moreover, during the sentencing hearing, the court expressly stated its finding that each defendant perjured himself.

With regard to the court's alleged failure to identify specific perjurious statements, that is not required under § 3C1.1.

---

[3] Indeed, this court has recognized that "the preferred device for raising an ineffective assistance of counsel claim is a federal habeas petition," which allows development of a factual record. *United States v. Medina*, 118 F.3d 371, 373 & n.2 (5th Cir. 1997) (per curiam).

15

*See Morris*, 131 F.3d at 1140 (district court found simply that "Morris was untruthful at trial with respect to material matters in this case"); *United States v. Como*, 53 F.3d 87, 89 (5th Cir. 1995) ("A separate and clear finding on each element of the alleged perjury, although preferable, is not required."). The district court did not clearly err in enhancing their sentences for perjury.

## VI. Sentence correction: Jurisdiction

Hipolito argues that the district court erred in granting the government's motion to correct his sentence under FED. R. CRIM. P. 35(c). We must first determine whether the district court had jurisdiction to correct the sentence.

### A.

FED. R. CRIM. P. 35(c) provides that "[t]he court, *acting within 7 days after the imposition of sentence*, may correct a sentence that was imposed as a result of arithmetical, technical, or other clear error" (emphasis added). We have held the 7-day period to be jurisdictional. *See United States v. Lopez*, 26 F.3d 512, 518-19 (5th Cir. 1994). We consider *de novo* whether the district court had jurisdiction to resentence. *See United States v. Bridges*, 116 F.3d 1110, 1112 (5th Cir. 1997).

The docket sheet reveals that the district court orally pronounced sentence (as to all three defendants) on November 8. On November 15, the government filed a motion for correcting Hipolito's sentence. The basis for the motion was that the court

16

had overlooked a notice of prior conviction§§Hipolito had been convicted in Arkansas for possession of marijuana with intent to distribute§§which would have resulted in a more severe sentence.[4] The government's motion was granted the same day; the court set resentencing for November 22. On November 21, judgment entered against all three defendants.[5] On November 22, the court orally pronounced sentence against Hipolito in the resentencing proceeding. The new judgment was entered against Hipolito on November 25.

## B.

The question presented is whether the initial sentence was "imposed" on November 8, when the court orally pronounced sentence§§or on November 21, when judgment entered. If the initial sentence was imposed on November 8, then the corrected sentence was not imposed within the 7-day window. The circuits have split on the meaning of "imposition." *See* Andrew P. Rittenberg, Comment, *"Imposing" a Sentence Under Rule 35(c)*, 65 U. CHI. L. REV. 285 (1998)(surveying cases and concluding that entry of judgment is the

---

[4] Under 21 U.S.C. §§ 841(b)(1)(B) and 851, Hipolito was subject to an enhanced penalty for his prior felony drug conviction. The government filed a notice of prior conviction that the district court overlooked in calculating Hipolito's sentence. The government caught this error and brought it to the court's attention within 7 days of oral pronouncement of sentence.

[5] It is unclear why judgment entered against Hipolito when the district court had already granted the motion to correct sentence and scheduled resentencing for the next day.

best point of measurement).  The Second, Fourth and Tenth Circuits have held that "imposition" of sentence means the date of oral pronouncement.  *See United States v. Layman*, 116 F.3d 105 (4th Cir. 1997)(oral pronouncement); *United States v. Abreu-Cabrera*, 64 F.3d 67, 74 (2d Cir. 1995) (oral pronouncement); *United States v. Townsend*, 33 F.3d 1230, 1231 (10th Cir. 1994) (same).  The First and Seventh Circuits have held that it refers to the date judgment enters. *See United States v. Clay*, 37 F.3d 338, 340 (7th Cir. 1994) (entry of judgment); *see also United States v. Morillo*, 8 F.3d 864, 869 (1st Cir. 1993) (same, in dicta).

The Fifth Circuit has not squarely addressed this question. The Fifth Circuit has taken what arguably could be characterized as inconsistent positions on when sentence is imposed.  In *United States v. Lopez*, 26, F.3d 512, 513 (5th Cir. 1994), the court treated the date of the sentencing hearing as the date of imposition, without stating whether the sentence was entered on that day or only orally announced.  In *United States v. Carmouche*, 138 F.3d 1014, 1016 (5th Cir. 1998), the court treated the date judgment was entered as the date of imposition, without mentioning what date the sentence was orally pronounced.  In neither case did the court grapple with the instant question, but simply stated, in conclusory fashion, that sentence was "imposed" on a particular date.  However, in *United States v. Bridges*, 116 F.3d 1110 (5th Cir. 1997), we used the dates of oral pronouncement as the

18

benchmarks under Rule 35(c).  *See id.* at 1112.  In that case, we determined that Bridges's initial sentence was "imposed" on the date of the original sentencing hearing and that the corrected sentence was "imposed" on the date of the resentencing hearing, even though the judgment was entered four days later.  *See id.*  It is not clear whether the district court ever entered judgment on Bridges's original sentence, so we did not confront the choice of which date to use for Rule 35(c) purposes.  Nonetheless, we find ourselves bound by *Bridges,* and join the Second, Fourth and Tenth Circuits in holding that "imposition" of sentence means the date of oral pronouncement.

Based on the foregoing, we conclude that the district court lacked jurisdiction to resentence Hipolito Gonzalez.  We therefore vacate Hipolito Gonzalez's sentence and remand with instructions to reinstate the original sentence.

### VII. Newly-discovered evidence

The defendants argue that the district court erred in denying their motion for a new trial on the basis of newly-discovered evidence.  We review the denial of such a motion for abuse of discretion.  *See United States v. Gresham*, 118 F.3d 258, 267 (5th Cir.), *cert. denied*, 118 S. Ct. 258 (1997).  "Such motions are disfavored and are reviewed with great caution." *Id*.  To prevail, the defendants must show that the evidence is so compelling that a new trial will probably produce an acquittal.  The defendants must

19

also show that the evidence was material, unknown to them at the time of trial, and that their failure to discover it was not through a lack of due diligence. *See id.*

Defendants claim that their mother received an anonymous call shortly after her sons' convictions. The caller directed her to a vacant lot in Laredo where she found a pile of car parts that bore the VIN of the 1990 Town Car owned by Gerardo Gonzalez. The DEA then re-examined the VIN of the Town Car they had impounded and discovered that it was really a 1993 Town Car stolen from a Laredo car dealer. Someone had superglued Gerardo's car's VIN over the true VIN. Accordingly, the Gonzalezes claim, the car transporting the drugs wasn't Gerardo's.

In denying the motion, the district court commented:

It is difficult to perceive what inference favorable to the Gonzalez brothers a jury would draw from this additional evidence. The defense position at trial was that the car Abelardo had driven into Mexico was stolen by someone who loaded it with the marijuana and abandoned it in the muddy field after a high speed chase with law enforcement in which Hipolito Gonzalez ran interference between law enforcement and the load vehicle, which he believed to be his brother's car. This new evidence would do nothing to corroborate the defense argument, unless it is believed that the thief of Abelardo's car, in Nuevo Laredo, Mexico, on the evening the crime was committed, instead of using Abelardo's 1990 Lincoln town car to transport marijuana, actually dismantled it, used its public VIN number to replace that of the 1993 Lincoln load car, stolen more than 8 months before from a car dealer in Laredo, Texas, and switched the license plates before loading it with marijuana. Moreover, the jury would have to believe that mysteriously, after the conviction, an anonymous individual obtained from the thief in Mexico the unused parts of the 1990 Lincoln, loaded and transported them from Mexico into the United

20

States, deposited them in a vacant lot, and telephoned Margarita Gonzalez to tell her where to find them. This fanciful scenario does little to enhance the credibility of the "car stolen at the fair" story that the jury did not accept at trial.

The district court did not err in denying the defendants' motion for a new trial.

## CONCLUSION

We affirm the defendants' convictions. Hipolito Gonzalez's sentence is vacated and remanded with instructions to reimpose the original sentence. We affirm the remaining sentences.

AFFIRMED in part, VACATED AND REMANDED WITH INSTRUCTIONS in part.