United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 20, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 05-30881
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MANUEL PEÑALOZA-DUARTE,
also known as Miguel Peñaloza-Duarte,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana, New Orleans
USDC No. 2:04-CR-273-2
_____

Before JOLLY, HIGGINBOTHAM, and DENNIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Manuel Peñaloza-Duarte ("Peñaloza") was convicted by a jury of aiding and abetting the possession of methamphetamine with the intent to distribute. On appeal, he argues that the evidence is insufficient to convict him beyond a reasonable doubt because it fails to show that he had any criminal intent to advance the crime. Indeed, he contends, the evidence showed hardly more than that he was a passenger in the vehicle with the knowledge that contraband was present. Furthermore, he argues, evidence of criminal intent is especially lacking when considered in the light that he had no criminal record and that he was a confidential informant for local California police. We agree and hold that there is insufficient

evidence to support the verdict.  We therefore REVERSE and VACATE Peñaloza's conviction and RENDER a judgment of acquittal.

I

On Tuesday, August 24, 2004, Louisiana State Police (LSP) Trooper Ryan Midkiff stopped a white Crown Victoria with California license plates for failing to signal a lane change.  The driver was later identified as Jesus Bermudez-Pineda ("Bermudez").  Peñaloza was seated in the passenger seat of the vehicle.  Bermudez told Midkiff that the passenger was his cousin.  When asked where he was going, Peñaloza said that he and his brother (Bermudez) were going to Florida to visit family.

Bermudez gave Midkiff consent to search the car.  During the search, Midkiff discovered seven tape-wrapped packages containing methamphetamine hidden under the glove compartment.  At trial it was stipulated that the methamphetamine weighed 876.8 grams with a purity level of 92 percent and that one kilogram of methamphetamine was worth approximately $40,000.  No clothes, luggage, or weapons were in the vehicle.

Peñaloza and Bermudez were placed under arrest, read their Miranda[1] rights, placed in the backseat of the same car, and transported to the police substation.  At the substation, after being placed in a different interview room from Bermudez, Peñaloza first told an LSP Trooper that he was working for the police.

_____

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

2

Peñaloza showed Trooper Thomas Noto, who specializes in Narcotics Trafficking, the business cards of Detective Mario Garcia of the Costa Mesa (California) Police Department and of Drug Enforcement Administration (DEA) Task Force Officer Dana Potts. He indicated in English[2] that he was working for Detective Garcia.

Peñaloza told Noto that while en route to Orlando, Florida, Bermudez told him that there were drugs in the car. Peñaloza stated that Garcia did not know about the drugs, but that he had planned to call Garcia at the next opportunity. Noto then contacted the local DEA office and was told that they knew nothing about the situation; Noto, however, did not call either Garcia or Potts. He later acknowledged that the two business cards Peñaloza provided proved to be legitimate.

While Peñaloza was still at the substation, DEA Special Agent David Drasutis arrived to assist in the investigation. He took custody of the suspects' personal effects, including their pay stubs, which showed that Peñaloza and Bermudez worked for the same employer. Drasutis then interviewed Peñaloza, who stated that he worked for the DEA in California and that Garcia was his control officer.[3] Peñaloza told Drasutis that he intended to contact

---

[2]Trooper Noto testified that he does not speak Spanish; the evidence at trial was that Peñaloza speaks Spanish and has only a "very poor understanding" of English.

[3]This conversation appears to have been conducted using a mixture of English and Spanish. Agent Drasutis testified that Peñaloza appeared to have "a very poor understanding of English" and that he himself spoke Spanish "very poorly. I would say

3

Garcia to inform him about the drugs and repeatedly asked to be permitted to contact Garcia, but was not allowed to do so.

Drasutis contacted Garcia and confirmed that Peñaloza was a documented confidential informant ("CI") for the Costa Mesa Police. Drasutis, who had confiscated Peñaloza's cell phone, reviewed the call list and determined that Peñaloza had recently placed a call to Garcia.

At some point, Senior Special Agent Robert Donald Reidell, who was with the United States Department of Homeland Security, Immigration and Customs Enforcement, arrived at the substation and then transported Peñaloza from the substation to the jail in Amite, Louisiana. During the trip, Peñaloza told Reidell that he had worked on and off for a police officer in Costa Mesa, California named Mario.[4] Reidell reminded him of his <u>Miranda</u> rights. Peñaloza then told Reidell that he knew the drugs had been placed in the car in Santa Ana, California, that he knew the people who placed the drugs in the car, and that the drugs were destined for Orlando. He stated that he did not know who was to receive the methamphetamine, but that Bermudez did. He told Reidell that he believed that the drugs came across the border in San Ysidro, California, in trucks.

tourist level."

[4]Agent Reidell testified that they spoke in both Spanish and English, that he is "proficient in the Spanish language" and that he often acts as a translator during interrogations.

In due course Peñaloza was indicted, pleaded not guilty and went to trial. His defense was that he was a CI, that he had no intent to violate the drug laws at any time and that the government had failed to prove that he possessed the methamphetamine with the intent to distribute.

At trial, Detective Garcia confirmed that Peñaloza was a CI and had been so for two years. Garcia testified that he used CIs to gather information and evidence of narcotics traffickers and to make controlled buys and deliveries of narcotics. Garcia said that before a purchase or delivery was contemplated, the control officer always spoke with his CI.

Garcia stated that he had instructed Peñaloza that during the course of any undercover operation, he (Peñaloza) should give him any information "right away," be truthful, and remain in constant contact. Garcia and Peñaloza had exchanged cellular telephone numbers. Garcia and Peñaloza also discussed procedures to be employed when a controlled purchase was contemplated. Peñaloza was instructed that such purchases were always done in conjunction with police supervision and that he was not to conduct such purchases by himself. Garcia testified that Peñaloza understood these procedures and that he had made at least five purchases prior to August 2004. Garcia testified that although he and Peñaloza conducted undercover purchases in other states, such purchases were

done "only by phone." Garcia also stated that he "never sent [Peñaloza] out of state to make purchases."

Garcia testified that he spoke with Peñaloza on the night of Saturday, August 21. At that time, Peñaloza told Garcia that there were "some people coming up from Mexico and that he was providing them with a ride up north." Peñaloza stated that "once up north they were going to meet a guy" and discuss business. Peñaloza told Garcia that he would drive back after the meeting and tell Garcia what had occurred. Garcia asked Peñaloza if the meeting involved any drugs or money. Peñaloza told Garcia "no" and that it was a meeting only. Garcia instructed Peñaloza to call him when he returned. Garcia did not speak with Peñaloza again. However, phone records showed that Peñaloza called Garcia at 3:15 p.m. on Sunday, August 22. Garcia did not answer and Peñaloza did not leave a voice message.

Garcia further testified that Peñaloza never mentioned transporting methamphetamine to Florida with Bermudez. Nor did Garcia authorize Peñaloza to become involved in such a transaction. Garcia stated that Peñaloza "came highly recommended from the detective who had handled him before" and that Peñaloza had proven himself to be dependable and reliable. Garcia's testimony was that Peñaloza had provided approximately a hundred tips and leads regarding drug trafficking and that Peñaloza knew "a lot of people in Southern California." Typically, when Peñaloza came to Garcia with a lead that someone was "in on a drug trade," Garcia would

6

tell Peñaloza "to get in good" with that person, "[t]ake a ride with that person, go out to eat with that person, do whatever it [took] to glean the information." Garcia told the jury that although Peñaloza was not a DEA informant at the time of his arrest, he (Garcia) had contacted DEA Agent Potts and filled out various forms early in 2004 in order to start the process of having Peñaloza confirmed as an official DEA informant.

Peñaloza was sentenced to 121 months in prison. He then filed this timely appeal.

III

Peñaloza challenges the sufficiency of the evidence to uphold his conviction. The sufficiency of the evidence is reviewed to determine whether any rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Because Peñaloza properly preserved this issue by moving for a judgment of acquittal at the close of the Government's case and at the close of all evidence, this issue is reviewed de novo. See United States v. Izydore, 167 F.3d 213, 219 (5th Cir. 1999). In evaluating the sufficiency of the evidence, we view all evidence and all reasonable inferences drawn from it in the light most favorable to the Government. United States v. Gourley, 168 F.3d 165, 168-69 (5th Cir. 1999). Review of the sufficiency does not include review of the weight of the evidence or of the credibility of the witnesses. United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993).

7

As we have noted, Peñaloza's conviction was for aiding and abetting the possession of methamphetamine with the intent to distribute. To convict a defendant for possession of methamphetamine with intent to distribute, the Government must prove that the defendant (1) knowingly (2) possessed methamphetamine (3) with the intent to distribute it. United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996). To prove that a defendant aided and abetted, the Government must prove that the three elements of the substantive offense occurred and that the defendant associated with the criminal venture, purposefully participated in the criminal activity, and sought by his actions to make the venture succeed. See United States v. Delagarza-Villareal, 141 F.3d 133, 140 (5th Cir. 1997); 18 U.S.C. § 2. "Association" means that the defendant shared in the principal's criminal intent. United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir. 1995). "Participation" means that the defendant engaged in some affirmative conduct designed to aid the venture or to assist the perpetrator of the crime. Id. Thus, "to aid and abet, a defendant must share in the intent to commit the offense as well as play an active role in its commission." United States v. Lombardi, 138 F.3d 559, 561 (5th Cir. 1998). It is not enough to show that he engaged in otherwise innocent activities that just happened to further the criminal enterprise. United States v. Beckner, 134 F.3d 714, 718-19 (5th Cir. 1998).

8

Turning to the instant case, the jury could reasonably have concluded that a knowing possession occurred because methamphetamine was found in Bermudez's car, in which Peñaloza was a passenger.[5] The jury could have also reasonably inferred, due to the large quantity of methamphetamine seized, that the methamphetamine was intended for distribution. See United States v. Quiroz-Hernandez, 48 F.3d 858, 868 (5th Cir. 1995). Thus, Peñaloza's conviction for aiding and abetting must be upheld if he knowingly associated himself with and engaged in some affirmative conduct designed to aid the criminal venture.

The Government contends that circumstantial evidence leads to inferences sufficient to satisfy these elements because (1) Peñaloza was familiar with the drug trade; (2) Peñaloza told Garcia he was headed "up north" from California instead of due east toward Florida and failed to contact him while en route to Florida; (3) Peñaloza failed to inform Trooper Midkiff promptly of the existence and location of the methamphetamine; (4) Peñaloza was acting contrary to procedures established with Detective Garcia and his trip to Florida was not authorized; and (5) Peñaloza told different stories about his involvement before admitting to Agent Reidell he had known the drugs were in the car.

---

[5]As long as a knowing possession occurred, a defendant charged with aiding and abetting may be convicted of the offense of possession with intent to distribute a controlled substance even if he did not have actual or constructive possession of the substance. See United States v. Gonzales, 121 F.3d 928, 936 (5th Cir. 1997).

The difficulty in concluding that this evidence establishes Peñaloza's guilt beyond a reasonable doubt is that all of the Government's proof is equally consistent with Peñaloza's credible defense that he was a longstanding CI who did not want to reveal himself to the driver and the lack of evidence that he knew where the car was destined when it left California. There was no evidence that showed Peñaloza loaded or witnessed loading of the drugs into the car, nor that he drove the car or otherwise advanced the criminal enterprise. See Jaramillo, 42 F.3d at 924 (holding that the defendant had participated by driving with the principal to the site of the drug transaction and carrying a large empty purse, presumably to stash money); United States v. Hernandez-Beltran, 867 F.2d 224, 227 (5th Cir. 1989) (finding that a defendant who drove an individual possessing cocaine to the border, let him cross on foot, met him on the other side, and drove him to a meeting had indeed aided and abetted). Close association with suspected drug traffickers, standing alone, is insufficient to sustain a conviction for aiding and abetting. See Hernandez-Beltran, 867 F.2d at 226. This principle is especially compelling when the defendant operates as a CI and has no criminal convictions.

Moreover, as we have indicated, the fact that Peñaloza failed to tell the LSP Troopers immediately that there was methamphetamine in the car is not necessarily affirmative conduct designed to further the criminal enterprise. It equally reflects Peñaloza's

10

consistently-offered defense that he would expose himself as a CI if he said anything before he was separated from Bermudez. In addition, Peñaloza's statements at the time of the stop raise questions related to linguistic difficulties. The evidence at trial indicated that the LSP Troopers spoke very little Spanish and that Peñaloza had a very poor understanding of English. The first officer Peñaloza met who spoke Spanish was DEA Agent Reidell. During their ride to the jail in Amite, Peñaloza was able to get across his full story regarding his work for Detective Garcia and his knowledge of the Florida trip.

While the Government argues that Peñaloza's story changed, it is also true that his story became clearer and more developed the easier it became for him to communicate with the police, both linguistically and because the driver Bermudez was not present. Furthermore, there is no inherent contradiction between the stories Peñaloza told Noto (the first officer with whom he spoke outside of Bermudez's presence) and Reidell (the first officer with whom he shared a common language). Although he communicated additional details to Reidell about the drugs being placed in the car in Santa Ana, no evidence indicates that he assisted in or witnessed any of this activity. We note further that the information Peñaloza provided to Reidell appears to have been the same type he regularly provided to Detective Garcia when in California.

We are required to reverse a conviction "if the evidence construed in favor of the verdict gives equal or nearly equal

circumstantial support to a theory of guilt and a theory of innocence of the crime charged." <u>Jaramillo</u>, 42 F.3d at 923 (quotation marks and citation omitted).[6] It appears clear in this case that the circumstantial evidence on which the government relies gives equal support to the theory offered by Peñaloza, namely that he was a trusted CI, with no criminal convictions, who wanted to protect his cover and who found himself a passenger in an automobile very far from home with no affirmative association in the criminal venture.

Thus, because the circumstantial evidence equally supports a theory of innocence of the crime charged, we find that it is insufficient to sustain the jury's verdict of guilt.

IV

For the foregoing reasons, the conviction is REVERSED and VACATED and a judgment of acquittal is RENDERED.

REVERSED, VACATED, and RENDERED.

---

[6]Peñaloza argues one theory of innocence: the evidence is insufficient for a reasonable jury to believe beyond a reasonable doubt that he is guilty. In addressing this single theory urged, we have evaluated the evidence in a light most favorable to the Government. That evidence is, at best, in equal balance and on that basis no reasonable jury could have found Peñaloza guilty. We therefore see no tension between this case and our holding in <u>United States v. Bell</u>, which reminds that "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." 678 F.2d 547, 549 (5th Cir. 1982) (en banc).

12