GRAVES, Circuit Judge,
concurring in part, dissenting in part:
Because I disagree with the majority that there was sufficient evidence to sus *266 tain a conviction of Jose Luis Ceballos-Amaya (Ceballos) for the second count of aiding and abetting the possession of marijuana with intent to distribute from April 9, 2009,1 would vacate Ceballos’ conviction on this count and remand for resentencing as to only the January 29, 2010, count. Therefore, I respectfully concur in part and dissent in part.
The majority finds that there was sufficient evidence that Ceballos participated in the offenses and shared in the intent to possess marijuana with the intent to distribute it. I agree that there was sufficient evidence to sustain a conviction for the first count, which occurred on January 29, 2010. However, I disagree with regard to the second count, which occurred on April 9, 2009. The facts, as set out in the opinion, do not support any finding that Ceballos participated in the April 9, 2009, offense. He was merely present on two different occasions when Abraham Vega (Abraham) arranged the deal with Gilbert Vasquez.
As stated by the majority, this Court will uphold a jury verdict if a rational trier of fact could conclude that the elements of the offense were established beyond a reasonable doubt. The Government must prove the defendant guilty beyond a reasonable doubt, not merely that he could have been guilty. United States v. Sacerio, 952 F.2d 860, 863 (5th Cir.1992). Although some of the circumstances may be suspicious, mere suspicion cannot support a verdict of guilty. Id. While a defendant “need not have actual or constructive possession of the drugs to be guilty of aiding and abetting possession with intent to distribute,” a conviction requires that the defendant’s “association and participation with the venture were in a way calculated to bring about the venture’s success.” United States v. Williams, 985 F.2d 749, 753 (5th Cir.1993). This court has further said:
To prove association, the evidence must show that the defendant shared the criminal intent of the principal. To prove participation, the evidence must show that the defendant committed an overt act that assisted in the success of the venture. Mere presence and association alone are insufficient to sustain a conviction for aiding and abetting, however, they are factors to be considered.
United States v. Lindell, 881 F.2d 1313, 1323 (5th Cir.1989) (internal citations omitted).[1] This Court has also said:
“Participation” means that the defendant engaged in some affirmative conduct designed to aid the venture or to assist the perpetrator of the crime. Id. Thus, “to aid and abet, a defendant must share in the intent to commit the offense as well as play an active role in its commission.” United States v. Lombardi, 138 F.3d 559, 561 (5th Cir.1998). It is not enough to show that he engaged in otherwise innocent activities that just happened to further the criminal enterprise. United States v. Beckner, 134 F.3d 714, 718-19 (5th Cir.1998).
United States v. Peñaloza-Duarte, 473 F.3d 575 (5th Cir.2006).
The majority finds that “Ceballos’s actions in assisting to recruit Vasquez and in watching over him at the motel show that he shared in the criminal intent and engaged in affirmative conduct to help the venture succeed.” However, the record does not support this finding. Also, the majority specifically fails to set out any “overt act” or actual participation, which *267 are required for a conviction. See Lindell, 881 F.2d 1313, and Williams, 985 F.2d 749.
The majority states that Vasquez testified that Ceballos was present with Abraham and Misael Peralta Longoria (Peralta) when they drove to the home of Vasquez’s father and “presented him with the proposition of making money.[2] Ceballos was ‘involved’ in the conversation concerning the recruitment of Vasquez.” While the record does establish that Ceballos went to the house with Peralta and Abraham, Vasquez testified unequivocally that Abraham presented him with the proposition of making money. Specifically, Vasquez said that Abraham called him and “said he would like to speak to me about a position that he had for me, that I could make some money.” (Emphasis added). Further, Vasquez testified that, upon arrival at his father’s house:
Abraham started talking to me, asked me if I was willing to make some money. He implied to me that I would have to come to Ojinaga, that they were furnishing a truck for me, that I needed — that they would pay me well; and if I was to do that, they would help me out with my bills with this truck that they had, which is that Ford dually that I got caught with.
Vasquez then identified Peralta as the person who gave him the title to the truck and $250 to get insurance. Further, Abraham and Peralta returned without Ceballos the following day to complete the transaction.
When asked whether Ceballos was “involved” in the conversation, Vasquez testified that on “Monday he was. On Tuesday when they went to go deliver my truck, it was just [Peralta] and Abraham.” When asked whether Ceballos was “participating” in the conversation, Vasquez answered, “[y]es.” Vasquez never testified how Ceballos was “involved” or “participating” in the conversation, nor did he testify as to any specific statements that Ceballos ever made or any specific “overt acts” establishing an attempt to recruit him. However, Vasquez did testify as to specific statements and “overt acts” of Abraham and Peralta. Often, Vasquez’s testimony referred to “they” or “them” which specified different individuals throughout the trial. On a few occasions, Vasquez indicated that a collective term included Ceballos. (“They were driving a green King Ranch truck.”) (“They came in this black Tahoe.”). However, more than once, Vasquez then also admitted that he was really only referring to someone other than Ceballos. (“They called me .... ” where “they” was Peralta and Abraham) (“They gave me the keys and gave me money .... ” where “they” was Peralta and Abraham) (“I had called them from there” where “them” was Abraham), (“I called them” where “them” was Cesar Pinedo) (“I told them” where “them” was Bruce McGraw).
Vasquez testified that Ceballos was present at the motel in Ojinaga at various times along with several other individuals. Vasquez also testified that Abraham told him that Peralta did not want Vasquez and Bruce McGraw running around Ojinaga and that they should stay at the motel. *268 Vasquez replied, “[y]es,” when asked, “[s]o Loco, this Defendant in the blue shirt, Abraham, and Cesar [Pinedo] were staying at the hotel, keeping an eye on you and [McGraw]?” As discussed more fully below, Vasquez’s testimony does not establish that he was ever prevented from leaving the motel. Vasquez did not mention Ceballos in his testimony regarding the following day, which would have been April 9, 2009, the day of the arrest, indicating that Ceballos did not actually stay the entire night at the motel. Also, Vasquez testified that he shared a room at the motel with only McGraw, who was injecting cocaine while Vasquez drank alcohol, further indicating Vasquez’s lack of knowledge regarding whether Ceballos actually stayed the entire night at the motel. Further, even if Ceballos was among a group “keeping an eye on” Vasquez, neither the record nor the opinion establishes that Ceballos did so because he shared the principal’s criminal intent or was acting to assist in the success of the venture, or how that was indicative of aiding and abetting the possession of marijuana with the intent to distribute. Vasquez’s testimony regarding this was, in relevant part:
Abraham told me that they didn’t want us to go anywhere, because they didn’t want us to leave. He said that they would rather us — for us not to go — you know, me and Bruce not to go anywhere because of the soldiers that were running around there in Ojinaga.
Vasquez then testified that “they” was Peralta. Vasquez also testified that McGraw kept telling him that he wanted to be reimbursed for his part of the money he’d spent on gas going to Ojinaga so he could go to a nearby store to get something to eat. This indicates that Vasquez and McGraw were free to leave at all times, as they had also done during a previous trip to Ojinaga, and that Abraham’s statement was merely a warning regarding them personal safety in Ojinaga as opposed to some sort of forced detention to ensure their participation in a drug smuggling operation. This is further established by Vasquez’s and McGraw’s threat to leave and go back to Odessa based on their mistaken belief that the deal was not going to happen. The pair decided to stay after Abraham told them to calm down and that the truck would be ready. Vasquez’s testimony indicates that he and McGraw stayed at the motel in Ojinaga because they wanted to complete the transaction and get paid, not because they were prevented from leaving and forced to complete the transaction.
As the majority correctly notes, to sustain a conviction for possession of marijuana with intent to distribute, the government must prove beyond a reasonable doubt the knowing possession of marijuana with intent to distribute. The Government need not prove the defendant committed each of these elements if he aided and abetted each element.
As stated previously, mere presence and association alone are insufficient to sustain a conviction for aiding and abetting, but both are factors to be considered. Lindell, 881 F.2d at 1323. “To prove association, the evidence must show that the defendant shared the criminal intent of the principal. To prove participation, the evidence must show that the defendant committed an overt act that assisted in the success of the venture.” Id.
Unlike with regard to both Abraham and Peralta, Vasquez never testified to anything with regard to Ceballos to establish that he shared the criminal intent of the principal or committed any overt act to assist in the success of the venture. Ceballos also did not offer any such evidence.
The majority cites authority for the proposition that this Court does not weigh *269 evidence or assess the credibility of witnesses and that the jury is free to choose among reasonable constructions of the evidence. See United States v. Ramos-Cardenas, 524 F.3d 600, 605 (5th Cir.2008). While this is true, “the government must do more than show that the defendants ‘could have been guilty.’ ” Id. (Internal citations omitted). “Therefore, if ‘the evidence tends to give equal or nearly equal circumstantial support to guilt and to innocence, ... Reversal is required....’” Id. The issue here is not the credibility of any witness, but rather the insufficiency of the evidence offered. Vasquez’s testimony does not establish an overt act. Only the Government’s characterization of Vasquez’s testimony alludes to an overt act. Further, the alleged acts, “participating” in a conversation and staying at a motel, are innocent activities. Peñaloza-Duarte, 473 F.3d 575.
For these reasons, a rational trier of fact could not conclude that the elements of the April 9, 2009, offense were established beyond a reasonable doubt. Further, the evidence shows neither association nor participation with regard to the April 9, 2009, offense, but rather indicates mere presence, which is not enough to sustain a conviction for aiding and abetting on this count. Therefore, I would vacate Ceballos’ conviction on this count and remand for resentencing as to only the January 29, 2010, count.

Leadership enhancement

With regard to the leadership enhancement, I disagree with the majority that the trial court did not err in applying the enhancement pursuant to Section 3Bl.l(c) to Ceballos’ sentence.[3] The evidence was insufficient to sustain the 2009 conviction.
■ Alternatively, even if there was sufficient evidence to sustain the conviction on the April 2009 offense, the district court erred in applying this enhancement because there is nothing in the record to indicate that Ceballos served in any kind of leadership role with regard to the 2009 offense. Additionally, the factual findings in the PSR, as adopted by the district court, do not have an adequate basis with a sufficient indicia of reliability.
The opinion refers to the PSR’s representation that Ceballos identified himself as belonging to La Linea and that Ceballos’ assisted in recruiting Vasquez. Further, the opinion states what the district court found. However, upon review of the record, I find no basis for either the statement in the PSR or the district court’s finding.
The relevant portion of the PSR says:
Vasquez agreed to cooperate with the government and provided a statement regarding his involvement with the drug smuggling operation. He reported that while working in Odessa, he met two individuals identified as Abraham Vega and Cesar Pinedo. On six to seven occasions, either Pinedo or Vega provided Vasquez with a quantity of marijuana, and cocaine to sell, and would give a portion of what he earned back to Vega or Pinedo. Approximately one week before his arrest, Vasquez was approached by Vega and two other individuals identified as Jose Luis Ceballos-Amaya and *270 Misael Peralta-Longoria. All three men stated they worked for a drug organization based in Mexico known as “La Linea.” Vega, Ceballos-Amaya, and Peralta-Longoria recruited Vasquez to transport a load of marijuana into the United States. Additionally, Vasquez told the men that he knew an individual, Bruce Evan McGraw, that wanted to make quick money and would help with the drug smuggling operation.
In response to Ceballos’ objection to the enhancement at sentencing, the Government asserted:
Also, regarding the incident in which Richard Vasquez [sic] testified regarding the April 2009 incident, this Defendant was more of a facilitator on behalf of Mr. Peralta in order to make sure Mr. Vasquez and Mr. McGraw would be successful in their venture trying to get the marijuana across on the River Road in south Presidio County.
In light of that, we believe he is a leader/organizer, but in the context of this case, he should not get the four-level increase but at least a two-level increase.
The district court noted the language in the PSR regarding all three men belonging to La Linea and recruiting Vasquez and said, additionally, that “McGraw, who was somebody they had identified who would do some of the transporting of the marijuana, met with Vega, Pinedo, Ceballos, and Peralta. And he helped recruit McGraw, helping direct him, as well as the information that was set forth in Probation’s answer to that.”
As set out above, the testimony of Vasquez fails to establish that he was recruited by Ceballos.[4] Also, during his testimony at trial, Vasquez did not say anything about Ceballos stating that he worked for La Linea. This statement is referenced in the February 8, 2010, attachment to the amended complaint filed on that same date. In that attachment, Sean Roach, Task Force Administrator for the Drug Enforcement Administration, said, in relevant part:
The cooperating defendant [Vasquez] stated that a little over a week prior to his arrest that Abraham, a hispanie he knew as Loco, and another hispanie male in his 30’s approached him at his residence in a green King Ranch Ford. Abraham asked the cooperating defendant if he wanted to work for them transporting marijuana, and that if he did he could earn $10,000.00 to $15,000.00 a month. The three men stated to the cooperating defendant that they worked for “La Linea” and for an individual out of Juarez, Mexico.
On June 24, 2009, cooperating defendant was shown photographs of Misael Peralta-Longoria, who he identified as the driver of the King Ranch truck. Cooperating defendant was also shown a photograph of Jose Luis Ceballos-Amaya, who he identified as Loco.
Lane crossing history shows that Peralta-Longoria and Ceballos-Amaya were in Ojinaga, Mexico at the time the cooperating defendants stated they were.
Roach also did not offer any testimony regarding anything contained in the above-quoted portion of this attachment. Also, while this portion of the attachment said *271 the three men stated they worked for La Linea, it does not say that the three men recruited Vasquez, but rather says “Abraham asked....”
Notwithstanding that this statement was not corroborated by any testimony at trial, Ceballos’ alleged involvement with La Linea alone would not prove that he was involved in the April 9, 2009, offense.
There was also no testimony regarding the recruitment of McGraw. Further, the PSR said:
McGraw also agreed to cooperate with the government and provided a statement regarding his involvement with the drug smuggling operation. McGraw reported that he and Vasquez were recruited by several individuals to smuggle marijuana into the United States, one of whom he identified as Cesar Pinedo. McGraw provided details regarding the drug smuggling attempt that were corroborated by Vasquez’s statement.
This clearly does not say that McGraw was recruited by Ceballos. Further, McGraw did not testify at trial and there was no evidence offered to support this finding.
Based on the district court’s statement quoted above, which said Ceballos “helped recruit McGraw,” and referenced “Probation’s answer,” it appears that the district court was possibly confusing McGraw with Billy Wayne King, the driver from the January 2010 offense. Ceballos objected to the leadership enhancement. The response from Probation said:
It appears the defendant’s role in the offense was that of a leader or an organizer. According to a statement by codefendant Gilbert Richard Vasquez, Ceballos-Amaya was one of the individuals who recruited him to transport marijuana from Mexico into the United States. In addition, Ceballos-Amaya was recorded directing his codefendant Billy Wayne King to the location where the marijuana shipment was to be delivered. He also sent King $100 via Western Union to help facilitate the drug smuggling operation. It appears that Ceballos-Amaya helped recruit and exercised a degree of control over his codefendants; therefore, he appears to be a leader and organizer of the instant offense and the presentence report will not be changed.
(Emphasis added). There is no mention of McGraw in this response. Additionally, only the emphasized sentence applies to the April 2009 offense.
As set out previously herein, Vasquez offered no testimony establishing that Ceballos recruited him. Vasquez’s testimony only established mere presence, which is insufficient to support a conviction let alone a leadership enhancement for the April 9, 2009, count. Vasquez’s affirmative response as to whether Ceballos was “involved” or “participated” in conversations during which Abraham and Peralta made specific statements indicating their shared criminal intent or committed overt acts to assist in the success of the venture was insufficient to establish that Ceballos served in any leadership capacity or recruited him.
Further, the Government’s response at sentencing, quoted above, that Ceballos was a “facilitator on behalf of Mr. Peralta in order to make sure Mr. Vasquez and Mr. McGraw would be successful in their venture trying to get the marijuana across on the River Road in south Presidio County” is absolutely not supported by the record. There is nothing to indicate that Ceballos facilitated anything or ever even spoke the words “River Road” or “marijuana” to Vasquez or McGraw.
The district court may adopt the facts contained in a PSR without further inquiry if the facts have an adequate basis with *272 sufficient indicia of reliability and the defendant does not rebut the evidence or otherwise demonstrate it is unreliable. United States v. Cabrera, 288 F.3d 163, 173-74 (5th Cir.2002). Confronted with an objection to the findings in the PSR, the party seeking an adjustment in the base offense level, the Government, must prove by a preponderance of the evidence that the adjustment is warranted. See United States v. Patterson, 962 F.2d 409, 415 (5th Cir.1992); United States v. Elwood, 999 F.2d 814, 817 (5th Cir.1993). However, “[b]ald, conclusionary statements do not acquire the patina of reliability by mere inclusion in the PSR.” Elwood, 999 F.2d at 817-818.
The findings in the PSR do not have an adequate basis with a sufficient indicia of reliability. They are merely bald, conclusionary statements that Ceballos recruited Vasquez and that he was working for La Linea. Vasquez’s mere affirmative response to the conclusionary allegation contained in the question presented by the Government of whether Ceballos was “involved” in or “participated” in conversations without any specific testimony of what he allegedly did limits Ceballos’ rebuttal to saying he did not. And he offered that. It is difficult to rebut because the evidence of what he allegedly did to recruit Vasquez is not contained in the record. Neither is the evidence that he was working for La Linea. More importantly, once Ceballos objected, the Government had the burden of proving by a preponderance of the evidence that the adjustment was warranted. As indicated by the Government’s response to the objection, it failed to do this and merely offered another bald, conclusionary statement.

Obstruction enhancement

Ceballos asserts that the district court erred in applying an obstruction of justice enhancement. I agree.
The majority cites United States v. Dunnigan, 507 U.S. 87, 88-89, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), for the proposition that this enhancement is permitted where the defendant committed perjury at trial, but the majority fails to set out how Ceballos perjured himself.
This Court reviews the district court’s factual determination that a defendant obstructed justice under Section 3C1.1 for clear error. United States v. Gonzalez, 163 F.3d 255, 263 (5th Cir.1998). In Dunnigan, the Supreme Court held that: “Upon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines. That requirement is consistent with our precedents and is not in contravention of the privilege of an accused to testify in her own behalf.” Dunnigan, 507 U.S. at 98, 113 S.Ct. 1111. (Emphasis added). However, as the Supreme Court also said, “[w]hen contested, the elements of perjury must be found by the district court with the specificity that we have stated, so the enhancement is far from automatic.” Id.
Under USSG § 3C1.1, if the defendant “willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction” the offense level is increased by two levels. The commentary to § 3C1.1 provides that “committing, suborning, or attempting to suborn perjury” is conduct to which this enhancement applies.
The PSR said that “Ceballos-Amaya willfully obstructed or impeded the administration of justice with respect to the investigation, prosecution, and sentencing of the instant offense of conviction and any relevant conduct. Pursuant to USSG § 3C1.1, Application Note 4(b), the defen *273 dant committed perjury by testifying to false information during his trial.”[5]
Ceballos submitted a written objection, to which Probation responded:
The defendant testified that on January 29, 2010, he was merely traveling to the grocery store to purchase medicine for his child when he was arrested (his wife testified that he was traveling to the store to purchase milk). However, agents recorded numerous phone calls between Ceballos-Amaya and his codefendant, Billy Wayne King, which-indicated that Ceballos-Amaya was directly participating with the drug smuggling venture at that time. In addition, the defendant and his family provided testimony regarding a trip the defendant made to Ojinaga, Chihuahua, Mexico. The testimony provided by the defendant appeared to contradict the testimony which was provided by family members. Therefore, it appears that Ceballos-Amaya provided false testimony and a corresponding two level increase for obstruction of justice is warranted.
To begin with, several portions of this response in the Addendum are contradictory to the record.[6] Ceballos testified that he went to Wal-Mart with Peralta to get some medicine for Peralta’s child, not Ceballos’ child. Ceballos’ wife did not testify that he was traveling to the store to get milk. Peralta’s wife testified that Peralta and Ceballos were “going to go buy milk and stuff. They were bringing it home for the kids.” (Emphasis added). Ceballos did not provide any testimony regarding a trip to Ojinaga that was contradictory to any testimony provided by family members. Ceballos testified that his family makes frequent trips to Mexico to visit his in-laws. With regard to the April 2009 offense, Ceballos testified that he and his family were in Ojinaga and “[w]e seen Abraham, and he was like, ‘Hey, we’re partying at this motel.’ He followed us over there.”[7] There was no statement by any family member contradictory to this. In fact, neither Ceballos’ wife nor Peralta’s wife were even asked about any trip to Ojinaga. Also, in offering evidence regarding border crossings, the Government failed to offer any evidence to disprove that Ceballos’ wife was in Ojinaga around April 2009.
With regard to Ceballos’ objection at trial to the obstruction enhancement, he and the Government made, arguments regarding the trip to Wal-Mart and whether Ceballos had knowledge of the marijuana in the truck during the January 2010 incident. The district court agreed with Ceballos that there was no willful attempt to obstruct justice with regard to the purpose of the trip to Wal-Mart, but found as follows:
*274 However, a defendant’s denial of guilt other than a denial of guilt under oath that constitutes perjury — the jury found beyond a reasonable doubt that the Defendant was involved willfully and knowingly and intentionally in the moving of these — in moving of the drugs. So by the defendant taking the witness stand and testifying that he had no knowledge of the drugs and was there just to work on the vehicle because it had broken down, the fact that he had sent $100.00, I believe it was by ... telegram to someplace to be picked up, the Court finds that that is — that the defendant did willfully obstruct administration of justice during the course of this case and his testimony was perjurious. And the Court finds that the two points for obstruction of justice are properly given in that instance.
As set out in the majority opinion, after intercepting King at the Marfa checkpoint, authorities set up a controlled delivery which included the ruse about the truck having mechanical problems. Ceballos wired $100 to King so that he could have the truck repaired. Ceballos never denied sending the $100. Ceballos did testify that he did not know about the marijuana in the truck and that he was going to attempt to repair the truck. Again, at the direction of the authorities, King had told Ceballos the truck was having mechanical problems. When Ceballos arrived at the location, he immediately lifted the hood of the truck, but then King started it and it was running fine. It is impossible for Ceballos to have perjured himself by recounting his belief in the Government’s ruse regarding mechanical problems. So, the only possible portion of Ceballos’ testimony that is not corroborated or possibly contradictory to other evidence presented at trial is whether he knew about the drugs in the truck in 2010. Peralta told authorities that he knew there was some type of drugs in the vehicle, but didn’t know what type or how much and was only getting paid to pick up the vehicle. When asked on cross-examination to respond to Peralta’s knowledge of the drugs, Ceballos testified that “[Peralta] never told me that. He just — I believe that he just — I was helping him to do mechanic work.” Ceballos also testified on direct that he did not know about the drugs in the truck. The record establishes that Peralta and Ceballos are brothers-in-law who often spend time together and help each other. It would appear that, if Peralta, who was portrayed as the leader, had limited knowledge of what was contained in the truck, then Ceballos would also have limited, if any, knowledge.[8]
Accordingly, the district court clearly erred to the extent that it relied on the wiring of $100 to fix the truck and Ceballos’ testimony that he was going to fix the truck as evidence of perjury. Further, the district did not make a “proper determination” in finding the elements of perjury with regard to Ceballos’ response to whether he had knowledge of the drugs in the truck.
For these reasons, I respectfully concur in part and dissent in part.

. This is consistent with and in addition to United States v. Pando Franco, 503 F.3d 389, 394 (5th Cir.2007), as cited by the majority.

. I note that there appeared to initially be some confusion with regard to Vasquez's identification of Ceballos and Peralta. Vasquez initially identified Ceballos as follows: "They call him Loco. I think it's the gentleman over there. I called — I referred to him as the owner of the King Ranch [pickup truck]. I don’t know his name.” (Emphasis added). However, Vasquez then repeatedly identified Peralta as the owner of the King Ranch. When asked if he saw Abraham or Loco (Ceballos) in the courtroom, Vasquez said, "[n]o, I don't see him.” He then identified Ceballos as the "man with the blue shirt” in the courtroom.

. I note that the opinion says, "Ceballos recruited Vasquez and wired $100 to King to facilitate the transfer of a load. Additionally, Ceballos directed King in the delivery of the load. This evidence supports the district court’s finding that Ceballos acted as a leader or organizer.” This statement makes it sound as if it is referring to only one load. However, Vasquez was only involved in the 2009 offense and King was only involved in the 2010 offense. There is no evidence that Ceballos acted as a leader with regard to the 2009 offense.

. Though it is not evidence, it is worth noting that in closing arguments, the Government said: "Mr. Peralta recruited Gilbert Vasquez. He gave him money before Mr. Vasquez came down in order to change over the title and get insurance on the vehicle.” With regard to the "defendants” in general, the Government said: "They recruited people, and they picked the stuff up.”

. The PSR also said that "[njumerous family members of the defendants testified at trial." Ceballos, Ceballos' wife, and Peralta’s wife testified. The PSR also said: "Ceballos-Amaya testified in his own behalf and provided testimony that contradicted testimony which was provided by his family members regarding the reason he was traveling to Ojinaga, Chihuahua, Mexico.” This will be discussed further herein..

. Also, again, this response muddles facts from both offenses. It starts out referring to the trip to Wal-Mart in January 2010 offense, then switches to the April 2009 offense with regard to the trip to Ojinaga. Thus combining the two offenses for the purpose of determining the appropriateness of an enhancement.

. The Government’s hearsay objection to this statement was sustained. Interestingly, during closing argument and in discussing Vasquez's agitation with regard to his initial trip to Ojinaga, the Government characterized it as, "Hey, I came down here to, you know, take this load, and yet you guys are just sitting around partying.”

. Also, technically, the question posed to Ceballos on direct was, "Did you know that there was marijuana in that truck?” On cross, the Government posed: "And you heard the testimony that he [Peralta] admitted — he knew there was something in the vehicle. He just didn’t know what type. And you had no idea about this?” To which Ceballos replied, "Exactly, sir.”