**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 17, 2012

No. 10-50940

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JOSE LUIS CEBALLOS-AMAYA;
MISAEL PERALTA-LONGORIA

Defendants-Appellants

Appeals from the United States District Court
for the Western District of Texas
USDC No. 10-cr-00063

Before BENAVIDES, STEWART, and GRAVES, Circuit Judges.

PER CURIAM:[*]

Jose Luis Ceballos-Amaya (Ceballos) and Misael Peralta-Longoria (Peralta) were indicted for one count of aiding and abetting the possession with intent to distribute 100-1000 kilograms of marijuana and one count of aiding and abetting the possession with intent to distribute 50-100 kilograms of marijuana. A jury found them guilty as charged. Ceballos appeals, challenging

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-50940

the sufficiency of the evidence to support his convictions. Ceballos also challenges his sentence, arguing that the district court erred in applying an enhancement for obstruction of justice and an enhancement based on his leadership role in the offense. Peralta appeals only his sentence, arguing that the district court erred in applying an enhancement for obstruction of justice. We find the evidence sufficient to sustain Ceballos's convictions and AFFIRM his convictions. Finding no reversible error, we AFFIRM Ceballos's sentence. Concluding that the district court clearly erred in applying an enhancement for obstruction of justice, we VACATE and REMAND Peralta's sentences for re-sentencing.

## I. FACTUAL AND PROCEDURAL HISTORY

On April 9, 2009, Border Patrol Agent Jason Denman (Agent Denman) was traveling down Highway 170 and observed a black Tahoe and a white Ford pickup truck traveling in tandem. Subsequently, Agent Denman conducted a stop of the Ford, while Border Patrol Agent Steve Randall (Agent Randall) conducted a stop of the Tahoe.

The driver of the Ford, identified as Gilbert Vasquez, was the only occupant of the vehicle. The vehicle was taken to the Presidio, Texas station to be searched, and marijuana was discovered hidden in the fuel tank. Agent Randall testified that he ran a license plate check on the Tahoe and discovered that the vehicle was registered to Cesar Pinedo. The vehicle and the driver, Bruce McGraw (McGraw), were likewise taken to the Presidio station. Marijuana was found in the vehicle. The amount of marijuana found in both vehicles totaled 89.6 kilograms.

At the trial in the instant case, Vasquez testified that he met Cesar Pinedo (Pinedo) and an individual identified only as Abraham, when they worked at F & W Coating. Subsequently, Abraham called Vasquez to offer him work. Abraham arrived at Vasquez's house with two other men to discuss the offer. In

2

No. 10-50940

court, Vasquez identified Ceballos, previously known to him only as "Loco," as one of the two men with Abraham. Vasquez also identified Peralta as the other man accompanying Abraham. Abraham told Vasquez that he would give him a white Ford pickup truck and money in exchange for Vasquez coming to Ojinaga, Chihuahua, Mexico, and hauling loads of marijuana across the border. Ceballos was "involved" and "participat[ed] in" this conversation.

Subsequently, Abraham and Peralta brought the truck to Vasquez. Vasquez and McGraw then traveled to Ojinaga. After they crossed the border, Vasquez called Abraham. Abraham arrived in the black Tahoe with Pinedo and Ceballos and took Vasquez and McGraw to a motel outside of Ojinaga. Vasquez testified that Ceballos, Abraham, and Pinedo stayed in the same motel.

On April 8, 2009, Peralta arrived and picked up the truck. Abraham instructed Vasquez and McGraw to remain in the motel because Peralta did not want them to leave "because of the soldiers that were running around there in Ojinaga." Vasquez also testified that Ceballos and the other men were "keeping an eye on"him while they were staying at the motel, waiting for the truck that was to be used to drive a load of marijuana. Further, Ceballos was with Abraham at the motel when Abraham told Vasquez "to calm down, that they would have the truck ready."

On April 9, 2009, at approximately noon, Peralta arrived at the motel and traveled with Vasquez in the Tahoe over the border. Peralta instructed Vasquez to meet him, Ceballos, Abraham, and Cesar in Odessa, where Vasquez would be paid. Pinedo traveled in the Ford with McGraw and another individual identified only as Mingo. Peralta, Pinedo, and Mingo then left the vehicles and returned to Mexico. Vasquez and McGraw separately drove away in the two vehicles but did not travel far before they encountered Border Patrol and were arrested as set forth above.

3

No. 10-50940

With respect to the second offense, on the afternoon of January 29, 2010, Border Patrol Agent Alexander Medina testified that he was working at the primary checkpoint in Marfa, when he encountered a suspicious white GMC tractor-trailer. Billy Wayne King (King) was identified as the driver and sole occupant of the truck. During a subsequent search, the vehicle was found to contain marijuana weighing 280.45 kilograms. Border Patrol Agent Ismael Fernandez (Agent Fernandez) of the DEA Task Force asked King whether he would be willing to cooperate in a controlled delivery operation. King agreed, and his phone calls were recorded. As instructed by the agents, King explained his travel delay to the intended recipients of the marijuana, who were later identified as Ceballos and Peralta, by stating that the vehicle had mechanical problems. Ceballos then wired $100 to King so that he could have the vehicle repaired.

Ceballos instructed King to meet them at an Odessa convenience store called Stripes. King and law enforcement authorities separately arrived at Stripes. Ceballos then instructed King to move the delivery to Church's Chicken Restaurant. After King moved to Church's Chicken, Ceballos asked him to move the truck again but was instructed by agents to say that the truck was inoperable. Shortly thereafter, Ceballos and Peralta met King at Church's Chicken. Ceballos opened the hood of King's vehicle and looked at the engine. After a minute or two, King started the truck. Ceballos entered King's truck, and Peralta returned to his truck.

At that point, the authorities decided to end the operation and activated lights and sirens. Peralta took off at a high rate of speed but was soon stopped. Ceballos and King were blocked from attempting to escape. After he was arrested, Peralta provided a statement in which he admitted that he knew the truck contained drugs but denied knowledge as to the type of drug. Ceballos denied any knowledge of the drugs.

4

No. 10-50940

The recorded phone conversations were presented to the jury. Agent Fernandez explained that the voices were identifiable once he heard Peralta and Ceballos speak. In one phone call, Ceballos identified himself as the individual who would be receiving the truck. In another call, the wire transfer from Ceballos was discussed. In a subsequent call, Ceballos instructed King to go to Stripes. Sergeant Sean Roach of the Brewster County Sheriff's Office testified that he reviewed King's cell phone and the phone that Ceballos was using. The two phones showed calls to each other. At the close of the Government's case, both defendants moved for judgments of acquittal, and the court denied the motions.

Ceballos presented the testimony of his wife, Lilliana Ceballos-Amaya.[1] She stated that her mother lives in Ojinaga, and her sister is married to Peralta. On the day of Ceballos's arrest, Lilliana testified that she and Ceballos had previously been at a birthday party at a Mr. Gatti's in Odessa for Peralta's daughter. Lilliana testified that at the time of his arrest Ceballos was working two jobs.

Ceballos testified in his own defense. In April of 2009, he and his wife had driven to Mexico to stay with his mother-in-law and father-in-law, who lived in Ojinaga. While in Ojinaga, Ceballos saw Abraham, whom he had known from high school. Ceballos admitted that he went to the motel where Vasquez was staying because Abraham had told him that they were "partying at this motel." However, he denied staying overnight and claimed no knowledge of the marijuana. He claimed he cut his family vacation in Mexico short when Pinedo asked Peralta and Ceballos for a ride back to Odessa to report Pinedo's vehicle stolen. On April 9, 2009, Ceballos, Peralta, Abraham, and Pinedo drove back to Odessa together in one vehicle. Ceballos claimed that he had his wife ride

---

[1] Although Lilliana is referred to as Ceballos's wife, during her testimony she stated that they were not married but were "just living together."

back with her sister to Odessa because he did not want his wife riding with Abraham and Pinedo.

Ceballos further testified that on January 29, 2010, he was getting ready to go to a birthday party for Peralta's daughter when Peralta called him. Peralta said that his cousin had called from Mexico, asking Peralta to go and help his friend whose truck had broken down in Alpine. The friend was later identified as King. Peralta asked Ceballos to go with him to Alpine, and Ceballos agreed. Peralta called again because he had changed his mind and did not want to drive to Alpine. Instead, he asked Ceballos to wire King $100 to have the truck repaired, and Ceballos did so.

After Ceballos and his wife attended the birthday party, he and Peralta went to Walmart to buy some medicine for Peralta's child. While they were driving to a Walmart in Odessa, Peralta received a phone call from King. Because Peralta did not speak English, and King did not speak Spanish, Peralta asked Ceballos to assist him in translating the phone call. When Ceballos took the phone, King asked who he was, and Ceballos responded "I'm the one who's going to receive" the truck. Ceballos testified that he "was going to receive it as like receive it to fix it." He further testified that he "never said [he] was going to receive the marijuana." Ceballos admitted to speaking with King numerous times on Peralta's phone. Ceballos testified that he changed the dropoff location from Stripes to Church's Chicken because he intended to take the truck to Peralta's friend's house to fix it. Ceballos knew that after he and Peralta were arrested Peralta had admitted that he knew there were drugs in the truck. Ceballos, however, claimed he had no knowledge of the drugs.

Mabel Peralta (Mabel) testified that she was Peralta's wife. She stated that they had lived in Odessa and in June 2009, the family moved to Ojinaga. On January 29, 2010, after having moved back to Odessa, their daughter's

No. 10-50940

birthday party was held at Mr. Gatti's. After the party, Peralta and Ceballos went to Wal-Mart at her request to purchase "milk and stuff" for the children.

At the close of all evidence, both defendants again moved for an acquittal, and the district court denied the motions. The jury returned a verdict, finding both defendants guilty on both counts.

Ceballos's presentence report (PSR) assessed a base offense level of 26. The PSR recommended a four-level increase for being a leader or organizer and a two-level increase for obstruction of justice. Therefore, Ceballos's total offense level was calculated at 32. Ceballos objected to both adjustments. The Government responded, arguing that a two-level increase for being a manager or supervisor was more appropriate in the case. The district court agreed with the Government, finding a two-level increase under U.S.S.G. § 3B1.1(c) was proper. The objection to the enhancement for obstruction of justice was overruled. Ceballos's total offense level was recalculated to 30. This offense level, combined with a Category III criminal history score, resulted in a guidelines range of 121-151 months. The district court sentenced Ceballos to concurrent terms of 121 months, to be followed by a total of five years of supervised release. Ceballos filed a timely notice of appeal.

Peralta's PSR assessed a base offense level of 26. He also received a four-level increase for being a leader or organizer and a two-level increase for obstruction of justice. His total offense level of 32, combined with a Category I criminal history score, yielded a guidelines range of 121-151 months. Peralta objected to both of the adjustments. The district court overruled Peralta's objections. Peralta was sentenced to concurrent terms of 121 months, to be followed by a total of five years of supervised release. Peralta filed a timely notice of appeal.

No. 10-50940

II.    ANALYSIS

A.    Sufficiency of the Evidence (Ceballos only)

Ceballos argues that the evidence presented at trial was insufficient to support his conviction.    Ceballos moved for a judgment of acquittal at the close of the Government's case and again at the close of all the evidence.    Accordingly, he preserved the issue for appellate review, and we review his challenge to the sufficiency of the evidence de novo.    *See United States v. Ollison*, 555 F.3d 152, 158 (5th Cir. 2009).

This Court will uphold a jury's verdict if a rational trier of fact could conclude that "the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict." *United States v. Percel*, 553 F.3d 903, 910 (5th Cir. 2008) (internal quotation marks and citation omitted).    Direct and circumstantial evidence are weighed equally, and it is not necessary that the evidence exclude every reasonable hypothesis of innocence.    *United States v. Mendoza*, 226 F.3d 340, 343 (5th Cir. 2000).    This Court does "not weigh evidence or assess the credibility of witnesses, and the jury is free to choose among reasonable constructions of the evidence." *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008).

"To sustain a conviction for possession of marijuana with intent to distribute, the government must prove beyond a reasonable doubt (1) knowing (2) possession of marijuana (3) with intent to distribute it." *United States v. Ricardo,* 472 F.3d 277, 282-83 (5th Cir. 2006) (internal quotation marks and citation omitted).    To prove aiding and abetting, the Government must establish that the defendant "(1) associated with the criminal venture; (2) purposefully participated in the crime; and (3) sought by his actions for it to succeed." *United States v. Pando Franco*, 503 F.3d 389, 394 (5th Cir. 2007).    To satisfy the association element, the Government must show that the defendant shared in

the criminal intent of the principal. Participation requires that the defendant engaged in some affirmative conduct designed to aid the venture or to assist the principal.

The Government need not prove that the defendant committed all elements of the substantive underlying offense if he aided and abetted each element. *United States v. Aguirre Aguirre,* 716 F.2d 293, 298 (5th Cir. 1983). Thus, a defendant "need not have actual or constructive possession of the drugs to be guilty of aiding and abetting possession with intent to distribute." *United States v. Williams,* 985 F.2d 749, 753 (5th Cir. 1993). Although a defendant's mere presence at the scene of a crime does not establish aiding and abetting, "the jury may consider presence and association as factors in determining whether the defendant is guilty of aiding and abetting." *Id.*

Ceballos argues that there was no evidence that he actually or constructively possessed the marijuana and that there was no evidence of shared intent. However, if the Government proved that Ceballos aided and abetted each element of the offense, it need not prove that Ceballos was in actual or constructive possession of the marijuana. *See Williams,* 985 F.2d at 753.

With respect to the April 2009 offense, Vasquez testified that Ceballos was present with Abraham and Peralta when they drove to his house and presented him with the proposition to make money by hauling loads of marijuana across the border. Ceballos was "involved" and "participat[ed] in" this conversation. Ceballos was also at the motel in Ojinaga. Ceballos admitted to encountering Vasquez at the motel. Vasquez also testified that Ceballos was "keeping an eye on"him while they were staying at the motel, waiting for the truck that was to be used to drive a load of marijuana. Further, Ceballos was with Abraham at the motel when Abraham told Vasquez "to calm down, that they would have the truck ready." Ceballos's actions in assisting to recruit Vasquez and in watching over him at the motel show that he shared in the criminal intent and engaged

No. 10-50940

in affirmative conduct to help the venture succeed. *See Pando Franco*, 503 F.3d at 394.[2]

Additionally, Ceballo's testimony attempting to explain why he supposedly cut his family vacation short and rode back to the United States on April 9, 2009, with Abraham, Peralta, and Pinedo instead of driving back with his family is rather implausible. The jury was free to reject Ceballos's testimony that on April 9, 2009, he rode back to the States with these men after Pinedo asked them for a ride because Pinedo's truck had been stolen. Ceballos's implausible testimony is circumstantial evidence of guilty knowledge. *United States v. Ortega Reyna,* 148 F.3d 540, 544 & n.17 (5th Cir. 1998). The jury clearly did not find Ceballos to be credible and thus was free to reject his testimony.

With regard to the January 2010 incident, the evidence established that Ceballos spoke with King numerous times on the phone to set the location for the delivery. The recorded telephone calls revealed that Ceballos identified himself as the one who would "receive" the truck. Once King arrived at Stripes, Ceballos changed the location to a Church's Chicken Restaurant. Ceballos testified that he changed the location to the restaurant because it would be easier for King to locate. However, this explanation does not make sense because Ceballos changed the location from Stripes to Church's Chicken *after* King had successfully arrived at Stripes. Additionally, Ceballos attempted to change the location a second time. In sharp contrast to Ceballos's explanation, Sergeant Roach testified that during controlled drug deliveries subjects will often change the location of the meeting place. The subjects would have "counter surveillance

---

[2] The dissent apparently discounts Vasquez's testimony because he did not testify as to Ceballos's specific statements and also parses through Vasquez's testimony attempting to cast doubt as to Vasquez's identification of Ceballos. Dissent at 2-4 & n.2. Further, the dissent attempts to discredit Vasquez's testimony because he had been drinking alcohol when he observed Ceballos at the hotel. *Id.* at 4. "It is not our role, however, under our standard of review for sufficiency of the evidence, to second-guess the determinations of the jury as to the credibility of the evidence." *United States v. Guidry*, 406 F.3d 314, 318 (5th Cir. 2005).

10

in place to see how many people follow to the new location." This tactic is referred to as a "heat run," which is used to determine whether law enforcement officers are observing the transaction. The jury was free to reject Ceballos's explanation and credit Sergeant Roach's interpretation of Ceballos's actions.

Moreover, during one of the phone calls Ceballos referred to himself as the person to "receive" the truck. The jury was free to disbelieve his explanation that "receive" the vehicle meant "fix" the vehicle.

Ceballos admitted to speaking with King numerous times during the day and arranging to meet him. Ceballos's actions in exiting the vehicle with Peralta at Church's Chicken, speaking on the phone with King, wiring money to King, referring to himself as the person who would "receive" the vehicle, and entering the vehicle with King all indicate that he was actively participating in the venture. *See Pando Franco*, 503 F.3d at 394. Ceballos's story reasonably could have been rejected by the jury as implausible. *See United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995) (resolving credibility determinations in favor of the verdict). There was sufficient evidence that Ceballos participated in the offense and shared in the intent to possess marijuana with the intent to distribute it. *See Pando Franco*, 503 F.3d at 393-94. Thus, viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found Ceballos guilty beyond a reasonable doubt. *See Percel*, 553 F.3d at 910.

B.　　Enhancement for Leadership Role (Ceballos only)

Ceballos argues that the district court erred in applying a two-level leadership enhancement under § 3B1.1(c). He contends that the district court, in making the determination to apply the enhancement, relied on evidence in the PSR that was not presented at trial. He further asserts that the evidence in the record shows only that he acted at the direction of Peralta.

Following *United States v. Booker*, 543 U.S. 220 (2005), sentences are reviewed for reasonableness in light of the sentencing factors in 18 U.S.C.

No. 10-50940

§ 3553(a). *United States v. Mares*, 402 F.3d 511, 519-20 (5th Cir. 2005). Pursuant to *Gall v. United States*, 552 U.S. 38, 51 (2007), we must determine whether the sentence imposed is procedurally sound, including whether the calculation of the advisory guidelines range is correct, and whether the sentence imposed is substantively reasonable. Review of the sentence's reasonableness is for an abuse of discretion. *Id.* We review the district court's interpretation and application of the Sentencing Guidelines de novo and its findings of fact for clear error. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008).

Section 3B1.1(c) provides for a two-level enhancement if the defendant is an organizer, leader, manager or supervisor of criminal activity. The commentary provides that a defendant qualifies for a § 3B1.1 enhancement if he was the organizer, leader, manager, or supervisor of one or more other participants. § 3B1.1, comment. (n.2). In determining whether a defendant had a leadership role, a court should consider the following factors:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.*, comment. (n.4).

The PSR indicated that Ceballos identified himself as belonging to La Linea, a drug organization based in Mexico. Ceballos assisted in recruiting Vasquez. Additionally, Ceballos directed King to locations for delivery of the marijuana.

The district court found that the leadership enhancement was warranted because Vasquez indicated that Ceballos was part of the group who recruited him. Ceballos identified himself as working for a drug organization known as

No. 10-50940

La Linea.  Additionally, McGraw met with Ceballos, who assisted in recruiting and directing him.   The district court noted that the information in the PSR supported his decision.

In determining a defendant's role in the offense, "a district court may adopt the facts contained in a PSR without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable." *United States v. Cabrera*, 288 F.3d 163, 173-74 (5th Cir. 2002).   Additionally, "a district court is permitted to draw reasonable inferences from the facts, and these inferences are fact-findings reviewed for clear error." *United States v. Caldwell*, 448 F.3d 287, 290 (5th Cir. 2006).

The record supports the district court's application of the leadership enhancement under § 3B1.1(c).  Ceballos recruited Vasquez and wired $100 to King to facilitate the transfer of a load.  Additionally, Ceballos directed King in the delivery of the load.  This evidence supports the district court's finding that Ceballos acted as a leader or organizer.  *See United States v. Villanueva*, 408 F.3d 193, 204 (5th Cir. 2005) (affirming four-level leadership enhancement because, inter alia, defendant recruited and hired a driver to smuggle aliens); *see also United States v. Giraldo*, 111 F.3d 21, 24-25 (5th Cir. 1997) (holding that recruitment of others supported findings that the defendant was a leader or organizer).

The dissent would find that the district court erred in applying the leadership enhancement "because there is nothing in the record to indicate that Ceballos served in any kind of leadership role with regard to the 2009 offense." Dissent at 7.  In this regard it faults our view because we consider Ceballos's conduct surrounding both offenses in evaluating whether the district court properly applied the leadership enhancement.  But the guidelines do not require

13

No. 10-50940

that the conduct surrounding each conviction must independently qualify for the enhancement. "As with the determination of drug quantities, the court may draw on all 'relevant conduct' when determining whether the defendant was an 'organizer or leader' for the purposes of the guidelines." *United States v. Laboy*, 351 F.3d 578, 585 (1st Cir. 2003) (citing *United States v. Ruiz-Batista*, 956 F.2d 351, 353-54 (1st Cir. 1992)). Indeed, the "introductory commentary to Chapter 3, part B simply states that the 'defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct) . . . and not solely on the basis of elements and acts cited in the count of conviction." *Id.* at 586 (quoting U.S.S.G. Ch.3, Pt.B, intro. cmt.) (emphasis added). Thus, in the instant case, the district court properly considered Ceballos's conduct surrounding both convictions in its application of a two-level leadership enhancement under § 3B1.1(c).

Finally, to the extent that Ceballos argues the district court erred in relying on information in the PSR, his argument fails. Ceballos offered no evidence at sentencing rebutting the facts in the PSR; thus, this argument is without merit. *See Cabrera*, 288 F.3d at 173-74. The preponderance of the evidence supports, and Ceballos has shown no clear error in, the district court's application of the leadership enhancement.

    C.    Obstruction of Justice Enhancement

        1.    Ceballos

Ceballos also contends that the district court erred in applying a two-level increase for obstruction of justice. In essence, Ceballos argues that the district court's application of the enhancement deprives a defendant of his right to assert a defense.

In *United States v. Dunnigan*, 507 U.S. 87, 88-89 (1993), the Supreme Court addressed the issue "whether the Constitution permits a court to enhance a defendant's sentence under [§ 3C1.1], if the court finds the defendant

committed perjury at trial." The Court held that "[u]pon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines . . . [and] [t]hat requirement . . . is not in contravention of the privilege of an accused to testify in her own behalf." *Id.* at 98. In so holding, the Court rejected the argument that an enhanced sentence for perjury undermines the right to testify and distorts the decision whether to remain silent. *Id.* at 96 (noting that the right to testify does not include the right to commit perjury). Ceballos acknowledges the Supreme Court's ruling in *Dunnigan* but maintains that the decision was wrongly decided. As such, Ceballos's argument is foreclosed.[3]

## 2. Peralta

Peralta challenges the district court's imposition of a two-level enhancement for obstruction of justice. He argues that the facts presented at trial do not support the district court's finding that Peralta suborned perjury by presenting the testimony of his wife. Peralta asserts that his wife did not present an alibi, excuse, or material fact.

Section 3C1.1 provides for a two-level increase in the offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and this conduct relates to "the defendant's offense of conviction." The commentary to the guidelines specifically

---

[3] The dissent would find the district court erred in applying a two-level enhancement for obstruction of justice. Dissent at 12-16. But the rationale and arguments advanced in the dissent to support such a view are not advanced in Ceballos's brief on appeal and therefore are not properly before us. As we view Ceballos's brief, he is raising one argument—that the Supreme Court wrongly decided *Dunnigan*, 507 U.S. 87, in order to preserve it for further review. Specifically, Ceballos's brief provides that: "With due respect to the Supreme Court and the precedent established by *Dunnigan*, the undersigned feels morally obliged to once again raise this issue due to its continuing Constitutional implications." Blue brief at 28. Accordingly, we address the only claim that Ceballos makes with respect to his obstruction of justice enhancement.

lists suborning perjury as an example of conduct to which the enhancement applies. § 3C1.1, comment. (n.4(b)).

Perjury is giving "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan,* 507 U.S. at 94. "[A] district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition." *Id.* at 95. Although it is preferable for the court to address each element of perjury in a separate and clear finding, it is sufficient if the court makes a finding of obstruction "that encompasses all of the factual predicates for a finding of perjury." *Id.* Testimony is material if it was designed to substantially affect the outcome of the case. *United States v. Como*, 53 F.3d 87, 90 (5th Cir. 1995). Subornation occurs whenever the defendant "procures another to commit any perjury." 18 U.S.C. § 1622. Credibility determinations are within the province of the district court. *United States v. Sotelo*, 97 F.3d 782, 799 (5th Cir. 1996). The district court's determination that a defendant obstructed justice under § 3C1.1 is a factual finding that we review for clear error. *United States v. Juarez-Duarte*, 513 F.3d 204, 208 (5th Cir. 2008).

After Peralta objected to the obstruction-of-justice enhancement in the PSR, the probation officer responded that Peralta's wife, Mabel, provided an alibi as to why Peralta was in Mexico at the time of the April 9, 2009 offense. At sentencing, the Government argued that Mabel testified Peralta was in Mexico for a family event and that he crossed the river with Pinedo to report something stolen. Peralta correctly notes that the Government mischaracterized Mabel's testimony.

At trial, Mabel did *not* testify that Peralta was in Mexico at a family event in April 2009. Mabel did testify that they moved from Odessa to Mexico in June of 2009, but that does not provide an alibi for the April 2009 offense. Mabel

testified that in January 2010, she and Peralta moved back to Odessa. On January 29, 2010, the night Peralta was arrested, she had been at their daughter's birthday party at a Mr. Gatti's in Odessa. She further testified that after the party Peralta and Ceballos went to Wal-Mart for "milk and stuff" for the children. However, this testimony clearly did not provide an alibi for the April 9, 2009 offense in Mexico. Nor did it provide an alibi for the January 29, 2010, offense in Odessa because Peralta was arrested at the scene of the offense and admitted that he knew drugs were in the truck.

At Peralta's sentencing hearing, the prosecutor, referring to Peralta's crossing the border in April of 2009, asserted that he had asked Mabel the following question on cross examination: "[w]ell, why didn't you travel with your husband at that time?" He further asserted that she had responded that "'the boys traveled with the boys, and the girls traveled with the girls,' or something to that effect." Because Mabel allegedly lied about the reason Peralta was in Ojinaga, the prosecutor argued that the enhancement should apply. The prosecutor was mistaken. Actually, it was Ceballos who testified that he was in Ojinaga with family on April 9, 2009. It was Ceballos who testified that the men and women drove back to Odessa separately. Ceballos testified that he had his wife ride back from Mexico with her sister because he did not want his wife riding with the two other men, Abraham and Pinedo. He testified that the reason he crossed the border with Peralta, Pinedo, and Abraham was to report Pinedo's vehicle stolen. Ceballos's testimony, however, was not the basis for Peralta's obstruction enhancement. Nonetheless, the district court applied the obstruction enhancement, expressly finding that Peralta "allow[ed] his wife to testify and to provide an alibi as to why the Defendant was in Mexico on or about April 9, 2009, which is Count Two of the indictment." As set forth above, Mabel gave no testimony regarding Peralta's presence in Mexico on April 9, 2009.

Thus, the district court's factual finding in support of the obstruction-of-justice enhancement is clearly erroneous.

Moreover, there is no indication that Mabel's testimony was deliberately false or material. It is unclear how Mabel's testimony concerning Peralta's whereabouts prior to his arrest on the night of January 29, 2010, would assist Peralta's defense because he was arrested at the scene of the offense, and it is undisputed that he admitted to knowledge of drugs in the truck. The district court erred in applying this enhancement.

The Government argues that even if the court erred in applying the enhancement, any error would be harmless because Peralta's sentencing range would be 97-121 months, and his sentence of 121 months falls within that range. His sentence would be presumed reasonable, and Peralta fails to rebut the presumption of reasonableness.

But for the error, Peralta's guidelines range would have been 97-121 months with a total offense level of 30 and a Category I criminal history score. If a district court committed a procedural error, the appellate court must remand unless the error was harmless. *United States v. Delgado-Martinez*, 564 F.3d 750, 753 (5th Cir. 2009). "A procedural error during sentencing is harmless if the error did not affect the district court's selection of the sentence imposed." *Id.* (internal quotation marks and citations omitted). The proponent of the sentence bears the burden of establishing that the error was harmless and "must point to evidence in the record that will convince [the reviewing court] that the district court had a particular sentence in mind and would have imposed it, notwithstanding the error made in arriving at the defendant's guideline range." *Id.* (internal quotation marks and citations omitted).

In *United States v. Ibarra-Luna*, 628 F.3d 712, 713-14 (5th Cir. 2010), this Court recognized that an error can be harmless even if the district court did not consider the correct guidelines range in its analysis. However, such an error is

harmless only if two requirements are met. *Id.* at 717-19. First, the Government must "convincingly demonstrate that the court actually *would* have followed the very same reasoning absent the error." *Id.* at 717. Second, the Government "must show that the . . . sentence the district court imposed was not influenced in any way by the erroneous Guidelines calculation." *Id.* at 719.

Here, the district court imposed a sentence at the bottom of the higher, incorrect guidelines range and stated that the guidelines range was "fair and reasonable." We see nothing in the record to indicate that the district court's reasoning in choosing a sentence would have been the same had it been confronted with a guidelines range of 97-121 months. The Government has not shown that Peralta's sentence was not influenced by an erroneous calculation. *See Ibarra-Luna*, 628 F.3d at 717-19.

III.   CONCLUSION

For the above reasons, we AFFIRM the convictions and sentences of Ceballos. We VACATE the sentences of Peralta and REMAND for re-sentencing in accordance with this opinion.

19

No. 10-50940

GRAVES, Circuit Judge, concurring in part, dissenting in part:

Because I disagree with the majority that there was sufficient evidence to sustain a conviction of Jose Luis Ceballos-Amaya (Ceballos) for the second count of aiding and abetting the possession of marijuana with intent to distribute from April 9, 2009, I would vacate Ceballos' conviction on this count and remand for resentencing as to only the January 29, 2010, count. Therefore, I respectfully concur in part and dissent in part.

The majority finds that there was sufficient evidence that Ceballos participated in the offenses and shared in the intent to possess marijuana with the intent to distribute it. I agree that there was sufficient evidence to sustain a conviction for the first count, which occurred on January 29, 2010. However, I disagree with regard to the second count, which occurred on April 9, 2009. The facts, as set out in the opinion, do not support any finding that Ceballos participated in the April 9, 2009, offense. He was merely present on two different occasions when Abraham Vega (Abraham) arranged the deal with Gilbert Vasquez.

As stated by the majority, this Court will uphold a jury verdict if a rational trier of fact could conclude that the elements of the offense were established beyond a reasonable doubt. The Government must prove the defendant guilty beyond a reasonable doubt, not merely that he could have been guilty. *United States v. Sacerio*, 952 F.2d 860, 863 (5th Cir. 1992). Although some of the circumstances may be suspicious, mere suspicion cannot support a verdict of guilty. *Id.* While a defendant "need not have actual or constructive possession of the drugs to be guilty of aiding and abetting possession with intent to distribute," a conviction requires that the defendant's "association and participation with the venture were in a way calculated to bring about the venture's success." *United States v. Williams*, 985 F.2d 749, 753 (5th Cir. 1993). This court has further said:

No. 10-50940

> To prove association, the evidence must show that the defendant shared the criminal intent of the principal. To prove participation, the evidence must show that the defendant committed an overt act that assisted in the success of the venture. Mere presence and association alone are insufficient to sustain a conviction for aiding and abetting, however, they are factors to be considered.

*United States v. Lindell*, 881 F.2d 1313, 1323 (5th Cir. 1989) (internal citations omitted).[1] This Court has also said:

> "Participation" means that the defendant engaged in some affirmative conduct designed to aid the venture or to assist the perpetrator of the crime. *Id.* Thus, "to aid and abet, a defendant must share in the intent to commit the offense as well as play an active role in its commission." *United States v. Lombardi*, 138 F.3d 559, 561 (5th Cir.1998). It is not enough to show that he engaged in otherwise innocent activities that just happened to further the criminal enterprise. *United States v. Beckner*, 134 F.3d 714, 718-19 (5th Cir.1998).

*United States v. Penaloza-Duarte*, 473 F.3d 575 (5th Cir. 2006).

The majority finds that "Ceballos's actions in assisting to recruit Vasquez and in watching over him at the motel show that he shared in the criminal intent and engaged in affirmative conduct to help the venture succeed." However, the record does not support this finding. Also, the majority specifically fails to set out any "overt act" or actual participation, which are required for a conviction. *See Lindell*, 881 F.2d 1313, and *Williams*, 985 F.2d 749.

The majority states that Vasquez testified that Ceballos was present with Abraham and Misael Peralta Longoria (Peralta) when they drove to the home of Vasquez's father and "presented him with the proposition of making money.[2]

---

[1] This is consistent with and in addition to *United States v. Pando Franco*, 503 F.3d 389, 394 (5th Cir. 2007), as cited by the majority.

[2] I note that there appeared to initially be some confusion with regard to Vasquez's identification of Ceballos and Peralta. Vasquez initially identified Ceballos as follows: "They call him Loco. I *think* it's the gentleman over there. I called – I referred to him as the owner of the King Ranch [pickup truck]. I don't know his name." (Emphasis added). However,

Ceballos was 'involved' in the conversation concerning the recruitment of Vasquez." While the record does establish that Ceballos went to the house with Peralta and Abraham, Vasquez testified unequivocally that Abraham presented him with the proposition of making money. Specifically, Vasquez said that Abraham called him and "said *he* would like to speak to me about a position that *he* had for me, that I could make some money." (Emphasis added). Further, Vasquez testified that, upon arrival at his father's house:

> Abraham started talking to me, asked me if I was willing to make some money. He implied to me that I would have to come to Ojinaga, that they were furnishing a truck for me, that I needed – that they would pay me well; and if I was to do that, they would help me out with my bills with this truck that they had, which is that Ford dually that I got caught with.

Vasquez then identified Peralta as the person who gave him the title to the truck and $250 to get insurance. Further, Abraham and Peralta returned without Ceballos the following day to complete the transaction.

When asked whether Ceballos was "involved" in the conversation, Vasquez testified that on "Monday he was. On Tuesday when they went to go deliver my truck, it was just [Peralta] and Abraham." When asked whether Ceballos was "participating" in the conversation, Vasquez answered, "[y]es." Vasquez never testified how Ceballos was "involved" or "participating" in the conversation, nor did he testify as to any specific statements that Ceballos ever made or any specific "overt acts" establishing an attempt to recruit him. However, Vasquez did testify as to specific statements and "overt acts" of Abraham and Peralta. Often, Vasquez's testimony referred to "they" or "them" which specified different individuals throughout the trial. On a few occasions, Vasquez indicated that a

---

Vasquez then repeatedly identified Peralta as the owner of the King Ranch. When asked if he saw Abraham or Loco (Ceballos) in the courtroom, Vasquez said, "[n]o, I don't see him." He then identified Ceballos as the "man with the blue shirt" in the courtroom.

collective term included Ceballos. ("They were driving a green King Ranch truck.") ("They came in this black Tahoe."). However, more than once, Vasquez then also admitted that he was really only referring to someone other than Ceballos. ("They called me...." where "they" was Peralta and Abraham) ("They gave me the keys and gave me money...." where "they" was Peralta and Abraham) ("I had called them from there" where "them" was Abraham), ("I called them" where "them" was Cesar Pinedo) ("I told them" where "them" was Bruce McGraw).

Vasquez testified that Ceballos was present at the motel in Ojinaga at various times along with several other individuals. Vasquez also testified that Abraham told him that Peralta did not want Vasquez and Bruce McGraw running around Ojinaga and that they should stay at the motel. Vasquez replied, "[y]es," when asked, "[s]o Loco, this Defendant in the blue shirt, Abraham, and Cesar [Pinedo] were staying at the hotel, keeping an eye on you and [McGraw]?" As discussed more fully below, Vasquez's testimony does not establish that he was ever prevented from leaving the motel. Vasquez did not mention Ceballos in his testimony regarding the following day, which would have been April 9, 2009, the day of the arrest, indicating that Ceballos did not actually stay the entire night at the motel. Also, Vasquez testified that he shared a room at the motel with only McGraw, who was injecting cocaine while Vasquez drank alcohol, further indicating Vasquez's lack of knowledge regarding whether Ceballos actually stayed the entire night at the motel. Further, even if Ceballos was among a group "keeping an eye on" Vasquez, neither the record nor the opinion establishes that Ceballos did so because he shared the principal's criminal intent or was acting to assist in the success of the venture, or how that was indicative of aiding and abetting the possession of marijuana with the intent to distribute. Vasquez's testimony regarding this was, in relevant part:

No. 10-50940

> Abraham told me that they didn't want us to go anywhere, because they didn't want us to leave. He said that they would rather us – for us not to go – you know, me and Bruce not to go anywhere because of the soldiers that were running around there in Ojinaga.

Vasquez then testified that "they" was Peralta. Vasquez also testified that McGraw kept telling him that he wanted to be reimbursed for his part of the money he'd spent on gas going to Ojinaga so he could go to a nearby store to get something to eat. This indicates that Vasquez and McGraw were free to leave at all times, as they had also done during a previous trip to Ojinaga, and that Abraham's statement was merely a warning regarding their personal safety in Ojinaga as opposed to some sort of forced detention to ensure their participation in a drug smuggling operation. This is further established by Vasquez's and McGraw's threat to leave and go back to Odessa based on their mistaken belief that the deal was not going to happen. The pair decided to stay after Abraham told them to calm down and that the truck would be ready. Vasquez's testimony indicates that he and McGraw stayed at the motel in Ojinaga because they wanted to complete the transaction and get paid, not because they were prevented from leaving and forced to complete the transaction.

As the majority correctly notes, to sustain a conviction for possession of marijuana with intent to distribute, the government must prove beyond a reasonable doubt the knowing possession of marijuana with intent to distribute. The Government need not prove the defendant committed each of these elements if he aided and abetted each element.

As stated previously, mere presence and association alone are insufficient to sustain a conviction for aiding and abetting, but both are factors to be considered. *Lindell*, 881 F.2d at 1323. "To prove association, the evidence must show that the defendant shared the criminal intent of the principal. To prove

24

No. 10-50940

participation, the evidence must show that the defendant committed an overt act that assisted in the success of the venture." *Id.*

Unlike with regard to both Abraham and Peralta, Vasquez never testified to anything with regard to Ceballos to establish that he shared the criminal intent of the principal or committed any overt act to assist in the success of the venture. Ceballos also did not offer any such evidence.

The majority cites authority for the proposition that this Court does not weigh evidence or assess the credibility of witnesses and that the jury is free to choose among reasonable constructions of the evidence. *See United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008). While this is true, "the government must do more than show that the defendants 'could have been guilty.'" *Id.* (Internal citations omitted). "Therefore, if 'the evidence tends to give equal or nearly equal circumstantial support to guilt and to innocence,' . . . Reversal is required . . . .'" *Id.* The issue here is not the credibility of any witness, but rather the insufficiency of the evidence offered. Vasquez's testimony does not establish an overt act. Only the Government's characterization of Vasquez's testimony alludes to an overt act. Further, the alleged acts, "participating" in a conversation and staying at a motel, are innocent activities. *Penaloza-Duarte*, 473 F.3d 575.

For these reasons, a rational trier of fact could not conclude that the elements of the April 9, 2009, offense were established beyond a reasonable doubt. Further, the evidence shows neither association nor participation with regard to the April 9, 2009, offense, but rather indicates mere presence, which is not enough to sustain a conviction for aiding and abetting on this count. Therefore, I would vacate Ceballos' conviction on this count and remand for resentencing as to only the January 29, 2010, count.

*Leadership enhancement*

No. 10-50940

With regard to the leadership enhancement, I disagree with the majority that the trial court did not err in applying the enhancement pursuant to Section 3B1.1(c) to Ceballos' sentence.[3] The evidence was insufficient to sustain the 2009 conviction.

Alternatively, even if there was sufficient evidence to sustain the conviction on the April 2009 offense, the district court erred in applying this enhancement because there is nothing in the record to indicate that Ceballos served in any kind of leadership role with regard to the 2009 offense. Additionally, the factual findings in the PSR, as adopted by the district court, do not have an adequate basis with a sufficient indicia of reliability.

The opinion refers to the PSR's representation that Ceballos identified himself as belonging to La Linea and that Ceballos' assisted in recruiting Vasquez. Further, the opinion states what the district court found. However, upon review of the record, I find no basis for either the statement in the PSR or the district court's finding.

The relevant portion of the PSR says:

Vasquez agreed to cooperate with the government and provided a statement regarding his involvement with the drug smuggling operation. He reported that while working in Odessa, he met two individuals identified as Abraham Vega and Cesar Pinedo. On six to seven occasions, either Pinedo or Vega provided Vasquez with a quantity of marijuana and cocaine to sell, and would give a portion of what he earned back to Vega or Pinedo. Approximately one week before his arrest, Vasquez was approached by Vega and two other individuals identified as Jose Luis Ceballos-Amaya and Misael Peralta-Longoria. All three men stated they worked for a drug organization based in Mexico known as "La Linea." Vega, Ceballos-

---

[3] I note that the opinion says, "Ceballos recruited Vasquez and wired $100 to King to facilitate the transfer of a load. Additionally, Ceballos directed King in the delivery of the load. This evidence supports the district court's finding that Ceballos acted as a leader or organizer." This statement makes it sound as if it is referring to only one load. However, Vasquez was only involved in the 2009 offense and King was only involved in the 2010 offense. There is no evidence that Ceballos acted as a leader with regard to the 2009 offense.

No. 10-50940

Amaya, and Peralta-Longoria recruited Vasquez to transport a load of marijuana into the United States. Additionally, Vasquez told the men that he knew an individual, Bruce Evan McGraw, that wanted to make quick money and would help with the drug smuggling operation.

In response to Ceballos' objection to the enhancement at sentencing, the Government asserted:

> Also, regarding the incident in which Richard Vasquez [sic] testified regarding the April 2009 incident, this Defendant was more of a facilitator on behalf of Mr. Peralta in order to make sure Mr. Vasquez and Mr. McGraw would be successful in their venture trying to get the marijuana across on the River Road in south Presidio County.
> In light of that, we believe he is a leader/organizer, but in the context of this case, he should not get the four-level increase but at least a two-level increase.

The district court noted the language in the PSR regarding all three men belonging to La Linea and recruiting Vasquez and said, additionally, that "McGraw, who was somebody they had identified who would do some of the transporting of the marijuana, met with Vega, Pinedo, Ceballos, and Peralta. And he helped recruit McGraw, helping direct him, as well as the information that was set forth in Probation's answer to that."

As set out above, the testimony of Vasquez fails to establish that he was recruited by Ceballos.[4] Also, during his testimony at trial, Vasquez did not say anything about Ceballos stating that he worked for La Linea. This statement is referenced in the February 8, 2010, attachment to the amended complaint filed on that same date. In that attachment, Sean Roach, Task Force Administrator for the Drug Enforcement Administration, said, in relevant part:

---

[4] Though it is not evidence, it is worth noting that in closing arguments, the Government said: "Mr. Peralta recruited Gilbert Vasquez. He gave him money before Mr. Vasquez came down in order to change over the title and get insurance on the vehicle." With regard to the "defendants" in general, the Government said: "They recruited people, and they picked the stuff up."

27

No. 10-50940

> The cooperating defendant [Vasquez] stated that a little over a week prior to his arrest that Abraham, a hispanic he knew as Loco, and another hispanic male in his 30's approached him at his residence in a green King Ranch Ford. Abraham asked the cooperating defendant if he wanted to work for them transporting marijuana, and that if he did he could earn $10,000.00 to $15,000.00 a month. The three men stated to the cooperating defendant that they worked for "La Linea" and for an individual out of Juarez, Mexico.
> . . .
>
> On June 24, 2009, cooperating defendant was shown photographs of Misael Peralta-Longoria, who he identified as the driver of the King Ranch truck. Cooperating defendant was also shown a photograph of Jose Luis Ceballos-Amaya, who he identified as Loco.
>
> Lane crossing history shows that Peralta-Longoria and Ceballos-Amaya were in Ojinaga, Mexico at the time the cooperating defendants stated they were.

Roach also did not offer any testimony regarding anything contained in the above-quoted portion of this attachment. Also, while this portion of the attachment said the three men stated they worked for La Linea, it does not say that the three men recruited Vasquez, but rather says "Abraham asked . . . ."

Notwithstanding that this statement was not corroborated by any testimony at trial, Ceballos' alleged involvement with La Linea alone would not prove that he was involved in the April 9, 2009, offense.

There was also no testimony regarding the recruitment of McGraw. Further, the PSR said:

> McGraw also agreed to cooperate with the government and provided a statement regarding his involvement with the drug smuggling operation. McGraw reported that he and Vasquez were recruited by several individuals to smuggle marijuana into the United States, one of whom he identified as Cesar Pinedo. McGraw provided details regarding the drug smuggling attempt that were corroborated by Vasquez's statement.

28

This clearly does not say that McGraw was recruited by Ceballos. Further, McGraw did not testify at trial and there was no evidence offered to support this finding.

Based on the district court's statement quoted above, which said Ceballos "helped recruit McGraw," and referenced "Probation's answer," it appears that the district court was possibly confusing McGraw with Billy Wayne King, the driver from the January 2010 offense. Ceballos objected to the leadership enhancement. The response from Probation said:

> It appears the defendant's role in the offense was that of a leader or an organizer. *According to a statement by codefendant Gilbert Richard Vasquez, Ceballos-Amaya was one of the individuals who recruited him to transport marijuana from Mexico into the United States.* In addition, Ceballos-Amaya was recorded directing his codefendant Billy Wayne King to the location where the marijuana shipment was to be delivered. He also sent King $100 via Western Union to help facilitate the drug smuggling operation. It appears that Ceballos-Amaya helped recruit and exercised a degree of control over his codefendants; therefore, he appears to be a leader and organizer of the instant offense and the presentence report will not be changed.

(Emphasis added). There is no mention of McGraw in this response. Additionally, only the emphasized sentence applies to the April 2009 offense.

As set out previously herein, Vasquez offered no testimony establishing that Ceballos recruited him. Vasquez's testimony only established mere presence, which is insufficient to support a conviction let alone a leadership enhancement for the April 9, 2009, count. Vasquez's affirmative response as to whether Ceballos was "involved" or "participated" in conversations during which Abraham and Peralta made specific statements indicating their shared criminal intent or committed overt acts to assist in the success of the venture was insufficient to establish that Ceballos served in any leadership capacity or recruited him.

29

Further, the Government's response at sentencing, quoted above, that Ceballos was a "facilitator on behalf of Mr. Peralta in order to make sure Mr. Vasquez and Mr. McGraw would be successful in their venture trying to get the marijuana across on the River Road in south Presidio County" is absolutely not supported by the record. There is nothing to indicate that Ceballos facilitated anything or ever even spoke the words "River Road" or "marijuana" to Vasquez or McGraw.

The district court may adopt the facts contained in a PSR without further inquiry if the facts have an adequate basis with sufficient indicia of reliability and the defendant does not rebut the evidence or otherwise demonstrate it is unreliable. *United States v. Cabrera*, 288 F.3d 163, 173-74 (5th Cir. 2002). Confronted with an objection to the findings in the PSR, the party seeking an adjustment in the base offense level, the Government, must prove by a preponderance of the evidence that the adjustment is warranted. *See United States v. Patterson*, 962 F.2d 409, 415 (5th Cir. 1992); *United States v. Elwood*, 999 F.2d 814, 817 (5th Cir. 1993). However, "[b]ald, conclusionary statements do not acquire the patina of reliability by mere inclusion in the PSR." *Elwood*, 999 F.2d at 817-818.

The findings in the PSR do not have an adequate basis with a sufficient indicia of reliability. They are merely bald, conclusionary statements that Ceballos recruited Vasquez and that he was working for La Linea. Vasquez's mere affirmative response to the conclusionary allegation contained in the question presented by the Government of whether Ceballos was "involved" in or "participated" in conversations without any specific testimony of what he allegedly did limits Ceballos' rebuttal to saying he did not. And he offered that. It is difficult to rebut because the evidence of what he allegedly did to recruit Vasquez is not contained in the record. Neither is the evidence that he was working for La Linea. More importantly, once Ceballos objected, the

No. 10-50940

Government had the burden of proving by a preponderance of the evidence that the adjustment was warranted. As indicated by the Government's response to the objection, it failed to do this and merely offered another bald, conclusionary statement.

***Obstruction enhancement***

Ceballos asserts that the district court erred in applying an obstruction of justice enhancement. I agree.

The majority cites *United States v. Dunnigan*, 507 U.S. 87, 88-89 (1993), for the proposition that this enhancement is permitted where the defendant committed perjury at trial, but the majority fails to set out how Ceballos perjured himself.

This Court reviews the district court's factual determination that a defendant obstructed justice under Section 3C1.1 for clear error. *United States v. Gonzales*, 163 F.3d 255, 263 (5th Cir. 1998). In *Dunnagin*, the Supreme Court held that: "Upon a *proper determination* that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines. That requirement is consistent with our precedents and is not in contravention of the privilege of an accused to testify in her own behalf." *Dunnagin*, 507 U.S. at 98. (Emphasis added). However, as the Supreme Court also said, "[w]hen contested, the elements of perjury must be found by the district court with the specificity that we have stated, so the enhancement is far from automatic." *Id.*

Under USSG § 3C1.1, if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" the offense level is increased by two levels. The commentary to § 3C1.1 provides that "committing , suborning, or attempting to suborn perjury" is conduct to which this enhancement applies.

31

No. 10-50940

The PSR said that "Ceballos-Amaya willfully obstructed or impeded the administration of justice with respect to the investigation, prosecution, and sentencing of the instant offense of conviction and any relevant conduct. Pursuant to USSG § 3C1.1, Application Note 4(b), the defendant committed perjury by testifying to false information during his trial."[5]

Ceballos submitted a written objection, to which Probation responded:

> The defendant testified that on January 29, 2010, he was merely traveling to the grocery store to purchase medicine for his child when he was arrested (his wife testified that he was traveling to the store to purchase milk). However, agents recorded numerous phone calls between Ceballos-Amaya and his codefendant, Billy Wayne King, which indicated that Ceballos-Amaya was directly participating with the drug smuggling venture at that time. In addition, the defendant and his family provided testimony regarding a trip the defendant made to Ojinaga, Chihuahua, Mexico. The testimony provided by the defendant appeared to contradict the testimony which was provided by family members. Therefore, it appears that Ceballos-Amaya provided false testimony and a corresponding two level increase for obstruction of justice is warranted.

To begin with, several portions of this response in the Addendum are contradictory to the record.[6] Ceballos testified that he went to Wal-Mart with Peralta to get some medicine for Peralta's child, not Ceballos' child. Ceballos' wife did not testify that he was traveling to the store to get milk. Peralta's wife testified that Peralta and Ceballos were "going to go buy milk *and stuff*. They

---

[5] The PSR also said that "[n]umerous family members of the defendants testified at trial." Ceballos, Ceballos' wife, and Peralta's wife testified. The PSR also said: "Ceballos-Amaya testified in his own behalf and provided testimony that contradicted testimony which was provided by his family members regarding the reason he was traveling to Ojinaga, Chihuahua, Mexico." This will be discussed further herein.

[6] Also, again, this response muddles facts from both offenses. It starts out referring to the trip to Wal-Mart in January 2010 offense, then switches to the April 2009 offense with regard to the trip to Ojinaga. Thus combining the two offenses for the purpose of determining the appropriateness of an enhancement.

32

No. 10-50940

were bringing it home for the kids." (Emphasis added). Ceballos did not provide any testimony regarding a trip to Ojinaga that was contradictory to any testimony provided by family members. Ceballos testified that his family makes frequent trips to Mexico to visit his in-laws. With regard to the April 2009 offense, Ceballos testified that he and his family were in Ojinaga and "[w]e seen Abraham, and he was like, 'Hey, we're partying at this motel.' He followed us over there."[7] There was no statement by any family member contradictory to this. In fact, neither Ceballos' wife nor Peralta's wife were even asked about any trip to Ojinaga. Also, in offering evidence regarding border crossings, the Government failed to offer any evidence to disprove that Ceballos' wife was in Ojinaga around April 2009.

With regard to Ceballos' objection at trial to the obstruction enhancement, he and the Government made arguments regarding the trip to Wal-Mart and whether Ceballos had knowledge of the marijuana in the truck during the January 2010 incident. The district court agreed with Ceballos that there was no willful attempt to obstruct justice with regard to the purpose of the trip to Wal-Mart, but found as follows:

> However, a defendant's denial of guilt other than a denial of guilt under oath that constitutes perjury – the jury found beyond a reasonable doubt that the Defendant was involved willfully and knowingly and intentionally in the moving of these – in moving of the drugs. So by the defendant taking the witness stand and testifying that he had no knowledge of the drugs and was there just to work on the vehicle because it had broken down, the fact that he had sent $100.00, I believe it was by . . . telegram to someplace to be picked up, the Court finds that that is – that the defendant did willfully obstruct administration of justice during the course of this case and his testimony was perjurious. And the Court finds that the

---

[7] The Government's hearsay objection to this statement was sustained. Interestingly, during closing argument and in discussing Vasquez's agitation with regard to his initial trip to Ojinaga, the Government characterized it as, "Hey, I came down here to, you know, take this load, and yet you guys are just sitting around partying."

two points for obstruction of justice are properly given in that instance.

As set out in the majority opinion, after intercepting King at the Marfa checkpoint, authorities set up a controlled delivery which included the ruse about the truck having mechanical problems. Ceballos wired $100 to King so that he could have the truck repaired. Ceballos never denied sending the $100. Ceballos did testify that he did not know about the marijuana in the truck and that he was going to attempt to repair the truck. Again, at the direction of the authorities, King had told Ceballos the truck was having mechanical problems. When Ceballos arrived at the location, he immediately lifted the hood of the truck, but then King started it and it was running fine. It is impossible for Ceballos to have perjured himself by recounting his belief in the Government's ruse regarding mechanical problems. So, the only possible portion of Ceballos' testimony that is not corroborated or possibly contradictory to other evidence presented at trial is whether he knew about the drugs in the truck in 2010. Peralta told authorities that he knew there was some type of drugs in the vehicle, but didn't know what type or how much and was only getting paid to pick up the vehicle. When asked on cross-examination to respond to Peralta's knowledge of the drugs, Ceballos testified that "[Peralta] never told me that. He just – I believe that he just – I was helping him to do mechanic work." Ceballos also testified on direct that he did not know about the drugs in the truck. The record establishes that Peralta and Ceballos are brothers-in-law who often spend time together and help each other. It would appear that, if Peralta, who was portrayed as the leader, had limited knowledge of what was contained in the truck, then Ceballos would also have limited, if any, knowledge.[8]

---

[8] Also, technically, the question posed to Ceballos on direct was, "Did you know that there was marijuana in that truck?" On cross, the Government posed: "And you heard the testimony that he [Peralta] admitted – he knew there was something in the vehicle. He just

34

No. 10-50940

Accordingly, the district court clearly erred to the extent that it relied on the wiring of $100 to fix the truck and Ceballos' testimony that he was going to fix the truck as evidence of perjury.  Further, the district did not make a "proper determination" in finding the elements of perjury with regard to Ceballos' response to whether he had knowledge of the drugs in the truck.

For these reasons, I respectfully concur in part and dissent in part.

---

didn't know what type.  And you had no idea about this?"  To which Ceballos replied, "Exactly, sir."